# RICHARDSON, WARDEN v. MARSH

No. 85–1433.   Argued January 14, 1987—Decided April 21, 1987

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MAR-SHALL, JJ., joined, *post*, p. 211.

*Timothy A. Baughman* argued the cause for petitioner. With him on the briefs was *John D. O'Hair.*

*Lawrence S. Robbins* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Trott,* and *Deputy Solicitor General Bryson.*

*R. Steven Whalen,* by appointment of the Court, 478 U. S. 1003, argued the cause and filed a brief for respondent.

JUSTICE SCALIA delivered the opinion of the Court.

In *Bruton* v. *United States,* 391 U. S. 123 (1968), we held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider

that confession only against the codefendant. Today we consider whether *Bruton* requires the same result when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial.

## I

Respondent Clarissa Marsh, Benjamin Williams, and Kareem Martin were charged with assaulting Cynthia Knighton and murdering her 4-year-old son, Koran, and her aunt, Ollie Scott. Respondent and Williams were tried jointly, over her objection. (Martin was a fugitive at the time of trial.) At the trial, Knighton testified as follows: On the evening of October 29, 1978, she and her son were at Scott's home when respondent and her boyfriend Martin visited. After a brief conversation in the living room, respondent announced that she had come to "pick up something" from Scott and rose from the couch. Martin then pulled out a gun, pointed it at Scott and the Knightons, and said that "someone had gotten killed and [Scott] knew something about it." Respondent immediately walked to the front door and peered out the peephole. The doorbell rang, respondent opened the door, and Williams walked in, carrying a gun. As Williams passed respondent, he asked, "Where's the money?" Martin forced Scott upstairs, and Williams went into the kitchen, leaving respondent alone with the Knightons. Knighton and her son attempted to flee, but respondent grabbed Knighton and held her until Williams returned. Williams ordered the Knightons to lie on the floor and then went upstairs to assist Martin. Respondent, again left alone with the Knightons, stood by the front door and occasionally peered out the peephole. A few minutes later, Martin, Williams, and Scott came down the stairs, and Martin handed a paper grocery bag to respondent. Martin and Williams then forced Scott and the Knightons into the basement, where Martin shot them. Only Cynthia Knighton survived.

In addition to Knighton's testimony, the State introduced (over respondent's objection) a confession given by Williams to the police shortly after his arrest. The confession was redacted to omit all reference to respondent—indeed, to omit all indication that *anyone* other than Martin and Williams participated in the crime.[1] The confession largely corrobo-

---

[1] The redacted confession in its entirety read:

"On Sunday evening, October the 29th, 1978, at about 6:30 p.m., I was over to my girl friend's house at 237 Moss, Highland Park, when I received a phone call from a friend of mine named Kareem Martin. He said he had been looking for me and James Coleman, who I call Tom. He asked me if I wanted to go on a robbery with him. I said okay. Then he said he'd be by and pick me up. About 15 or 20 minutes later Kareem came by in his black Monte Carlo car. I got in the car and Kareem told me he was going to stick up this crib, told me the place was a numbers house. Kareem said there would be over $5,000 or $10,000 in the place. Kareem said he would have to take them out after the robbery. Kareem had a big silver gun. He gave me a long barrelled *[sic]* .22 revolver. We then drove over to this house and parked the car across the big street near the house. The plan was that I would wait in the car in front of the house and then I would move the car down across the big street because he didn't want anybody to see the car. Okay, Kareem went up to the house and went inside. A couple of minutes later I moved the car and went up to the house. As I entered, Kareem and this older lady were in the dining room, a little boy and another younger woman were sitting on the couch in the front room. I pulled my pistol and told the younger woman and the little boy to lay on the floor. Kareem took the older lady upstairs. He had a pistol, also. I stayed downstairs with the two people on the floor. After Kareem took the lady upstairs I went upstairs and the lady was laying on the bed in the room to the left as you get up the stairs. The lady had already given us two bags full of money before we ever got upstairs. Kareem had thought she had more money and that's why we had went upstairs. Me and Kareem started searching the rooms but I didn't find any money. I came downstairs and then Kareem came down with the lady. I said, 'Let's go, let's go.' Kareem said no. Kareem then took the two ladies and little boy down the basement and that's when I left to go to the car. I went to the car and got in the back seat. A couple of minutes later Kareem came to the car and said he thinks the girl was still living because she was still moving and he didn't have any more bullets. He asked me how come I didn't go down the basement and I said I wasn't doing no shit like that. He then dropped me back off at my girl's house in Highland

rated Knighton's account of the activities of persons other than respondent in the house. In addition, the confession described a conversation Williams had with Martin as they drove to the Scott home, during which, according to Williams, Martin said that he would have to kill the victims after the robbery. At the time the confession was admitted, the jury was admonished not to use it in any way against respondent. Williams did not testify.

After the State rested, respondent took the stand. She testified that on October 29, 1978, she had lost money that Martin intended to use to buy drugs. Martin was upset, and suggested to respondent that she borrow money from Scott, with whom she had worked in the past. Martin and respondent picked up Williams and drove to Scott's house. During the drive, respondent, who was sitting in the backseat, "knew that [Martin and Williams] were talking" but could not hear the conversation because "the radio was on and the speaker was right in [her] ear." Martin and respondent were admitted into the home, and respondent had a short conversation with Scott, during which she asked for a loan. Martin then pulled a gun, and respondent walked to the door to see where the car was. When she saw Williams, she opened the door for him. Respondent testified that during the robbery she did not feel free to leave and was too scared to flee. She said that she did not know why she prevented the Knightons from escaping. She admitted taking the bag from Martin, but said that after Martin and Williams took the victims into the basement, she left the house without the bag. Respondent insisted that she had possessed no prior knowledge that Martin and Williams were armed, had heard no conversation about anyone's being harmed, and had not intended to rob or kill anyone.

Park and I was supposed to get together with him today, get my share of the robbery after he had counted the money. That's all." App. in No. 84–1777 (CA6), pp. 88–90.

During his closing argument, the prosecutor admonished the jury not to use Williams' confession against respondent. Later in his argument, however, he linked respondent to the portion of Williams' confession describing his conversation with Martin in the car.[2] (Respondent's attorney did not object to this.) After closing arguments, the judge again instructed the jury that Williams' confession was not to be considered against respondent. The jury convicted respondent of two counts of felony murder in the perpetration of an armed robbery and one count of assault with intent to commit murder. The Michigan Court of Appeals affirmed in an unpublished opinion, *People* v. *Marsh*, No. 46128 (Dec. 17, 1980), and the Michigan Supreme Court denied leave to appeal, 412 Mich. 927 (1982).

Respondent then filed a petition for a writ of habeas corpus pursuant to 28 U. S. C. § 2254. She alleged that her conviction was not supported by sufficient evidence and that introduction of Williams' confession at the joint trial had violated her rights under the Confrontation Clause. The District Court denied the petition. Civ. Action No. 83–CV–2665–DT (ED Mich., Oct. 11, 1984). The United States Court of Appeals for the Sixth Circuit reversed. 781 F. 2d 1201 (1986). The Court of Appeals held that in determining whether *Bruton* bars the admission of a nontestifying codefendant's confession, a court must assess the confession's "inculpatory

---

[2] The prosecutor said:

"It's important in light of [respondent's] testimony when she says Kareem drives over to Benjamin Williams' home and picks him up to go over. What's the thing that she says? 'Well, I'm sitting in the back seat of the car.' 'Did you hear any conversation that was going on in the front seat between Kareem and Mr. Williams?' 'No, couldn't hear any conversation. The radio was too loud.' I asked *[sic]* you whether that is reasonable. Why did she say that? Why did she say she couldn't hear any conversation? She said, 'I know they were having conversation but I couldn't hear it because of the radio.' Because if she admits that she heard the conversation and she admits to the plan, she's guilty of at least armed robbery. So she can't tell you that." *Id.*, at 164.

value" by examining not only the face of the confession, but also all of the evidence introduced at trial. 781 F. 2d, at 1212. Here, Williams' account of the conversation in the car was the only *direct* evidence that respondent knew before entering Scott's house that the victims would be robbed and killed. Respondent's own testimony placed her in that car. In light of the "paucity" of other evidence of malice and the prosecutor's linkage of respondent and the statement in the car during closing argument, admission of Williams' confession "was powerfully incriminating to [respondent] with respect to the critical element of intent." *Id.*, at 1213. Thus, the Court of Appeals concluded, the Confrontation Clause was violated. We granted certiorari, 476 U. S. 1168 (1986), because the Sixth Circuit's decision conflicts with those of other Courts of Appeals which have declined to adopt the "evidentiary linkage" or "contextual implication" approach to *Bruton* questions, see, *e. g.*, *United States* v. *Belle*, 593 F. 2d 487 (CA3 1979) (en banc).

## II

The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." The right of confrontation includes the right to cross-examine witnesses. See *Pointer* v. *Texas*, 380 U. S. 400, 404, 406–407 (1965). Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand.

Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions, *Francis* v. *Franklin*, 471 U. S. 307, 325, n. 9 (1985), which we have applied in many varying contexts. For example, in *Harris* v. *New York*, 401 U. S. 222 (1971),

we held that statements elicited from a defendant in violation of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), can be introduced to impeach that defendant's credibility, even though they are inadmissible as evidence of his guilt, so long as the jury is instructed accordingly. Similarly, in *Spencer* v. *Texas*, 385 U. S. 554 (1967), we held that evidence of the defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt. Accord, *Marshall* v. *Lonberger*, 459 U. S. 422, 438–439, n. 6 (1983). See also *Tennessee* v. *Street*, 471 U. S. 409, 414–416 (1985) (instruction to consider accomplice's incriminating confession only for purpose of assessing truthfulness of defendant's claim that his own confession was coerced); *Watkins* v. *Sowders*, 449 U. S. 341, 347 (1981) (instruction not to consider erroneously admitted eyewitness identification evidence); *Walder* v. *United States*, 347 U. S. 62 (1954) (instruction to consider unlawfully seized physical evidence only in assessing defendant's credibility). In *Bruton*, however, we recognized a narrow exception to this principle: We held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. We said:

> "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. . . ." 391 U. S., at 135–136 (citations omitted).

There is an important distinction between this case and *Bruton*, which causes it to fall outside the narrow exception we have created. In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. *Id.*, at 124, n. 1. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." *Id.*, at 135. By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).[3]

Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule.

Even more significantly, evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce. If

---

[3] The dissent is mistaken in believing we "assum[e] that [Williams'] confession did not incriminate respondent." *Post*, at 215, n. 3. To the contrary, the very premise of our discussion is that respondent would have been harmed by Williams' confession *if* the jury had disobeyed its instructions. Our disagreement pertains not to whether the confession incriminated respondent, but to whether the trial court could properly assume that the jury did not use it against her.

limited to facially incriminating confessions, *Bruton* can be complied with by redaction—a possibility suggested in that opinion itself. *Id.*, at 134, n. 10. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial. The "contextual implication" doctrine articulated by the Court of Appeals would presumably require the trial judge to assess at the end of each trial whether, in light of all of the evidence, a nontestifying codefendant's confession has been so "powerfully incriminating" that a new, separate trial is required for the defendant. This obviously lends itself to manipulation by the defense— and even without manipulation will result in numerous mistrials and appeals. It might be suggested that those consequences could be reduced by conducting a pretrial hearing at which prosecution and defense would reveal the evidence they plan to introduce, enabling the court to assess compliance with *Bruton ex ante* rather than *ex post*. If this approach is even feasible under the Federal Rules (which is doubtful—see, *e. g.*, Fed. Rule Crim. Proc. 14), it would be time consuming and obviously far from foolproof.

One might say, of course, that a certain way of assuring compliance would be to try defendants separately whenever an incriminating statement of one of them is sought to be used. That is not as facile or as just a remedy as might seem. Joint trials play a vital role in the criminal justice system, accounting for almost one-third of federal criminal trials in the past five years. Memorandum from David L. Cook, Administrative Office of the United States Courts, to Supreme Court Library (Feb. 20, 1987) (available in Clerk of Court's case file). Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more codefendants. Confessions by one or more of the defendants are commonplace—and indeed the probability of confession increases with the number

of participants, since each has reduced assurance that he will be protected by his own silence. It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.[4] The other way of assuring compliance with an expansive *Bruton* rule would be to forgo use of codefendant confessions. That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Moran* v. *Burbine*, 475 U. S. 412, 426 (1986) (citation omitted).

---

[4] The dissent notes that "all of the cases in this Court that involved joint trials conducted after *Bruton* was decided, in which compliance with the rule of that case was at issue, appear to have originated in a state court." *Post*, at 219. It concludes from this that "[f]ederal prosecutors seem to have had little difficulty" in implementing *Bruton* as the dissent believes it must be implemented. *Ibid.* Since the cases in question number only a handful, the fact that they happened to be state cases may signify nothing more than that there are many times more state prosecutions than federal. There is assuredly no basis to believe that federal prosecutors have been applying the dissent's interpretation of *Bruton*. Indeed the contrary proposition—as well as the harmfulness of that interpretation to federal law enforcement efforts—is suggested by the fact that the Solicitor General has appeared here as *amicus* to urge reversal for substantially the reasons we have given. See Brief for United States as *Amicus Curiae*.

The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. On the precise facts of *Bruton,* involving a facially incriminating confession, we found that accommodation inadequate. As our discussion above shows, the calculus changes when confessions that do not name the defendant are at issue. While we continue to apply *Bruton* where we have found that its rationale validly applies, see *Cruz* v. *New York, ante,* p. 186, we decline to extend it further. We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.[5]

In the present case, however, the prosecutor sought to undo the effect of the limiting instruction by urging the jury to use Williams' confession in evaluating respondent's case. See *supra,* at 205, and n. 2. On remand, the court should consider whether, in light of respondent's failure to object to the prosecutor's comments, the error can serve as the basis for granting a writ of habeas corpus. See *Wainwright* v. *Sykes,* 433 U. S. 72 (1977).

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The rationale of our decision in *Bruton* v. *United States,* 391 U. S. 123, 135–136 (1968), applies without exception to all

---

[5] We express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun.

inadmissible confessions that are "powerfully incriminating." Today, however, the Court draws a distinction of constitutional magnitude between those confessions that directly identify the defendant and those that rely for their inculpatory effect on the factual and legal relationships of their contents to other evidence before the jury. Even if the jury's indirect inference of the defendant's guilt based on an inadmissible confession is much more devastating to the defendant's case than its inference from a direct reference in the codefendant's confession, the Court requires the exclusion of only the latter statement. This illogical result demeans the values protected by the Confrontation Clause. Moreover, neither reason nor experience supports the Court's argument that a consistent application of the rationale of the *Bruton* case would impose unacceptable burdens on the administration of justice.

## I

It is a "basic premise" of the Confrontation Clause that certain kinds of hearsay "are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give."[1]

---

[1] *Bruton* v. *United States*, 391 U. S. 123, 138 (1968) (Stewart, J., concurring) (emphasis in original). Judge Learned Hand and Justice Frankfurter also would recognize that the admission of Williams' confession, even with limiting instructions, placed too great a strain upon the jury's ability to exclude this evidence from its consideration of respondent's innocence or guilt. As we noted in *Bruton:*

"Judge Hand addressed the subject several times. The limiting instruction, he said, is a 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else,' *Nash* v. *United States*, 54 F. 2d 1006, 1007; 'Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result is not to let in hearsay,' *United States* v. *Gottfried*, 165 F. 2d 360, 367; 'it is indeed very hard to believe that a jury will, or for that matter can, in practice observe the admonition,' *Delli Paoli* v. *United States*, 229 F. 2d 319, 321. Judge Hand referred to the instruction as a 'placebo,' medically defined as 'a medicinal lie.' " 391 U. S., at 132, n. 8.

This constitutionally mandated skepticism undergirds the *Bruton* holding and is equally applicable to this case. The Court framed the issue in *Bruton* as "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." 391 U. S., at 123–124. We answered that question in the affirmative, noting that the Sixth Amendment is violated "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Id.*, at 135–136.

Today the Court nevertheless draws a line between codefendant confessions that expressly name the defendant and those that do not. The Court relies on the presumption that in the latter category "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." *Ante*, at 208. I agree; but I do not read *Bruton* to require the exclusion of *all* codefendant confessions that do not mention the defendant.[2] Some such confessions may not have any significant impact on the defendant's case. But others will. If we presume, as we must, that jurors give their full and vigorous attention to every witness and each item of evidence, the very acts of listening and seeing will sometimes lead them down "the path of inference." Indeed, the Court tacitly acknowledges this point; while the Court speculates that the judge's instruction may dissuade the jury

---

In a similar vein, Justice Frankfurter observed:

"The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds." *Delli Paoli* v. *United States*, 352 U. S. 232, 248 (1957) (dissenting opinion).

[2] Indeed, I have no doubt that there are some codefendant confessions that expressly mention the defendant but nevertheless need not be excluded under *Bruton* because they are not prejudicial.

from making inferences at all, it also concedes the probability of their occurrence, arguing that there is no overwhelming probability that jurors will be unable to "disregard an incriminating inference." *Ibid.* *Bruton* has always required trial judges to answer the question whether a particular confession is or is not "powerfully incriminating" on a case-by-case basis; they should follow the same analysis whether or not the defendant is actually named by his or her codefendant.

Instructing the jury that it was to consider Benjamin Williams' confession only against him, and not against Clarissa Marsh, failed to guarantee the level of certainty required by the Confrontation Clause. The uncertainty arose because the prosecution's case made it clear at the time Williams' statement was introduced that the statement would prove "powerfully incriminating" of the *respondent* as well as of Williams himself. There can be absolutely no doubt that spreading Williams' carefully edited confession before the jury intolerably interfered with the jury's solemn duty to treat the statement as nothing more than meaningless sounds in its consideration of Marsh's guilt or innocence.

At the time that Williams' confession was introduced, the evidence already had established that respondent and two men committed an armed robbery in the course of which the two men killed two persons and shot a third. *Ante,* at 202. There was a sharp dispute, however, on the question whether respondent herself intended to commit a robbery in which murder was a foreseeable result, or knew that the two men planned to do so. The quantum of evidence admissible against respondent was just sufficient to establish this intent and hence to support her conviction. As the Court of Appeals explained:

> "[T]he issue is whether the evidence was sufficient to show that Marsh aided and abetted the assault with the specific intent to murder Knighton or with the knowledge that Martin had this specific intent . . . . Marsh's case presents a much closer question on this issue than

does Williams'. There was no testimony indicating she harbored an intent to murder Knighton, nor was there any showing that she heard Martin's statements regarding the need to 'hurt' or 'take out' the victims. There was, in addition, no testimony placing her in the basement, the scene of the shootings. The evidence does indicate, viewed in the light most favorable to the prosecution, that she was aware that Williams and Martin were armed, that she served as a guard or 'lookout' at the door, that she prevented an attempted escape by Knighton, and that she was given the paper bag thought to contain the proceeds of a robbery. The evidence also indicates that Marsh knew Scott, supporting the inference that it was Marsh who allowed Martin to gain entrance. While it is a close question, we believe the evidence presented at the time of the motion was sufficient to survive a motion for directed verdict." 781 F. 2d 1201, 1204 (CA6 1986) (emphasis omitted).

In the edited statement that the jury was instructed not to consider against Marsh, Williams described the conversation he had with Kareem Martin while they were in a car driving to their victims' residence. In that conversation, Martin stated that "he would have to take them out after the robbery." See *ante*, at 203, n. 1. The State's principal witness had testified that Martin and Marsh arrived at the victims' house together. The jury was therefore certain to infer from the confession that respondent had been in the car and had overheard the statement by Martin. Viewed in the total context of the trial evidence, this confession was of critical importance because it was the only evidence directly linking respondent with the specific intent, expressed before the robbery, to kill the victims afterwards.[3] If Williams had taken

---

[3] The Court assumes that the confession did not incriminate respondent at the time the confession was introduced. I disagree. Cynthia Knighton had already testified that respondent and Kareem Martin had arrived at

the witness stand and testified, respondent's lawyer could have cross-examined him to challenge his credibility and to establish or suggest that the car radio was playing so loudly that Marsh could not have overheard the conversation between the two men from the backseat. An acknowledgment of the possibility of such facts by Williams would have done much more to eliminate the certainty beyond a reasonable doubt that Marsh knew about the murder plan than could possibly have been achieved by the later testimony of respondent herself. Moreover, the price respondent had to pay in order to attempt to rebut the obvious inference that she had overheard Martin was to remind the jury once again of what he had said and to give the prosecutor a further opportunity to point to this most damaging evidence on the close question of her specific intent. See *ante,* at 205, n. 2.

The facts in this case are, admittedly, different from those in *Bruton* because Williams' statement did not directly mention respondent. Thus, instead of being "incriminating on its face," *ante,* at 208, it became so only when considered in connection with the other evidence presented to the jury. The difference between the facts of *Bruton* and the facts of this case does not eliminate their common, substantial, and constitutionally unacceptable risk that the jury, when resolving

the victims' residence together, and that respondent admitted Williams to the house a few minutes later. In his statement Williams said:

"We then drove over to this house and parked the car across the big street near the house. The plan was that I would wait in the car in front of the house and then I would move the car down across the big street because he didn't want anybody to see the car. Okay, Kareem went up to the house and went inside. A couple of minutes later I moved the car and went up to the house." *Ante,* at 203, n. 1.

It is unrealistic to believe that the jury would assume that respondent did not accompany the two men in the car but had just magically appeared at the front door of the apartment at the same time that Martin did.

a critical issue against respondent, may have relied on impermissible evidence.[4]

## II

The facts that joint trials conserve prosecutorial resources, diminish inconvenience to witnesses, and avoid delays in the administration of criminal justice have been well known for a long time. See *United States* v. *Lane*, 474 U. S. 438, 449 (1986) (quoting *Bruton*, 391 U. S., at 134). It is equally well known that joint trials create special risks of prejudice to one of the defendants, and that such risks often make it necessary to grant severances. See *Bruton*, 391 U. S., at 131; Fed. Rule Crim. Proc. 14 (Relief from Prejudicial Joinder). The Government argues that the costs of requiring the prosecution to choose between severance and not offering the codefendant's confession at a joint trial outweigh the benefits to the defendant. Brief for United States as *Amicus Curiae* 22. On the scales of justice, however, considerations of fairness normally outweigh administrative concerns.

In the *Bruton* case the United States argued that the normal "benefits of joint proceedings should not have to be sacri-

---

[4] It is worth noting that the dissenting opinion in *Bruton* did not regard the Court's decision as limited to codefendant confessions expressly implicating the defendant:

"I would suppose that it will be necessary to exclude all extrajudicial confessions unless all portions of them which implicate defendants other than the declarant are effectively deleted. *Effective deletion will probably require not only omission of all direct and indirect inculpations of codefendants but also of any statement that could be employed against those defendants once their identity is otherwise established.*" 391 U. S., at 143 (emphasis added) (WHITE, J., dissenting).

The author of that opinion today adheres to that interpretation of *Bruton*. See *Cruz* v. *New York*, *ante*, at 195–196 (WHITE, J., dissenting) ("[A] codefendant's out-of-court statements implicating the defendant are not only hearsay but also have traditionally been viewed with special suspicion. . . . *Bruton* held that where the defendant has not himself confessed, there is too great a chance that the jury would rely on the codefendant's confession").

ficed by requiring separate trials in order to use the confession against the declarant." See 391 U. S., at 134. The Court endorsed the answer to this argument that Judge Lehman of the New York Court of Appeals had previously made in his dissenting opinion in *People* v. *Fisher*, 249 N. Y. 419, 432, 164 N. E. 336, 341 (1928):

> "We still adhere to the rule that an accused is entitled to confrontation of the witnesses against him and the right to cross-examine them . . . . We destroy the age-old rule which in the past has been regarded as a fundamental principle of our jurisprudence by a legalistic formula, required of the judge, that the jury may not consider any admissions against any party who did not join in them. We secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty. That price is too high."

The concern about the cost of joint trials, even if valid, does not prevail over the interests of justice. Moreover, the Court's effort to revive this concern in a state criminal case rests on the use of irrelevant statistics. The Court makes the startling discovery that joint trials account for "almost one-third of federal criminal trials in the past five years." *Ante*, at 209. In the interest of greater precision, the Court might have stated that there were 10,904 federal criminal trials involving more than one defendant during that 5-year period.[5] The Court might have added that the data base from which that figure was obtained does not contain any information at all to show the number of times that confessions were offered in evidence in those 10,904 federal cases.[6] The

---

[5] See Memorandum from David L. Cook, Administrative Office of the United States Courts, to Supreme Court Library (Feb. 20, 1987) (available in Clerk of Court's case file).

[6] See Memorandum from David L. Cook, Administrative Office of the United States Courts, to Supreme Court Library (Mar. 25, 1987) (available in Clerk of Court's case file) (establishing that figures cited in Memoran-

relevance of this data is also difficult to discern because all of the cases in this Court that involved joint trials conducted after *Bruton* was decided, in which compliance with the rule of that case was at issue, appear to have originated in a state court. *Federal* prosecutors seem to have had little difficulty, in conducting the literally thousands of joint trials to which the Court points, in maintaining "both the efficiency and the fairness of the criminal justice system" that the Court speculates will occur if *Bruton*'s reasoning is applied to this case. See *ante*, at 210. Presumably the options of granting immunity, making plea bargains, or simply waiting until after a confessing defendant has been tried separately before trying to use his admissions against an accomplice have enabled the Federal Government to enforce the criminal law without sacrificing the basic premise of the Confrontation Clause.[7]

---

dum of February 20, 1987, cited *ante*, at 209, carry no information whatever about the number of multiple-defendant trials in which a codefendant's confession was offered or admitted).

[7] The Court expresses an apparently deep-seated fear that an evenhanded application of *Bruton* would jeopardize the use of joint trials. This proposition rests on the unsupported assumption that the number of powerfully incriminating confessions that do not name the defendant is too large to be evaluated on a case-by-case basis. The Court then proceeds to the ostensible administrative outrages of the separate trials that would be necessary, contending that it would be unwise to compel prosecutors to "bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Ante*, at 210. This speculation also floats unattached to any anchor of reality. Since the likelihood that more than one of the defendants in a joint trial will have confessed is fairly remote, the prospect of "presenting the same evidence again and again" is nothing but a rhetorical flourish. At worst, in the typical case, two trials may be required, one for the confessing defendant and another for the nonconfessing defendant or defendants. And even in that category, presumably most confessing defendants are likely candidates for plea bargaining.

The Court also expresses concern that trial judges will be unable to determine whether a codefendant's confession that does not directly mention the defendant and is inadmissible against him will create a substantial risk of unfair prejudice. In most such cases the trial judge can comply with the dictates of *Bruton* by postponing his or her decision on the admissibility of the confession until the prosecution rests, at which time its potentially inculpatory effect can be evaluated in the light of the government's entire case. The Court expresses concern that such a rule would enable "manipulation by the defense," see *ante*, at 209, by which the Court presumably means the defense might tailor its evidence to make sure that a confession which does not directly mention the defendant is deemed powerfully incriminating when viewed in light of the prosecution's entire case. As a practical matter, I cannot believe that there are many defense lawyers who would deliberately pursue this high-risk strategy of "manipulating" their evidence in order to enhance the prejudicial impact of a codefendant's confession. Moreover, a great many experienced and competent trial judges throughout the Nation are fully capable of managing cases and supervising counsel in order to avoid the problems that seem insurmountable to appellate judges who are sometimes distracted by illogical distinctions and irrelevant statistics.

I respectfully dissent.[8]

---

[8] Except for Williams' confession, and the prosecutor's closing argument that will be separately considered on remand, there was a paucity of other evidence connecting respondent with the plan discussed in the car on the way to the victims' home. The Court of Appeals was thus unquestionably correct in concluding that the violation of the Confrontation Clause in this case was not harmless error.