[613 NYS2d 198]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
FAROOK KHAN, REHMAN SADRUDDIN, JAVED KAHN,
TAUQEER GUL, and FAISAL SALEEM, Appellants.

Second Department, June 6, 1994

## APPEARANCES OF COUNSEL

*Peluso & Touger,* New York City *(Carl T. Peluso* of counsel), for Farook Kahn, appellant.

*Joseph V. DiBlasi,* Forest Hills *(Steven R. Bernhard* of counsel), for Rehman Sadruddin, appellant.

*Philip L. Weinstein,* New York City *(Adrienne Hale* of counsel), for Javed Kahn, appellant.

*Tauqeer Gul, pro se,* and *Michael E. Lipson,* Garden City, for Tauqeer Gul, appellant.

*James Kousouros,* Kew Gardens *(Debra Kay Kousouros* of counsel), for Faisal Saleem, appellant.

*Richard A. Brown, District Attorney* of Queens County, Kew Gardens *(Steven J. Chananie, John M. Castellano, Daniel J. O'Reilly, Gary Fidel* and *Annette Cohen* of counsel), for respondent.

## OPINION OF THE COURT

LAWRENCE, J.

The issue to be decided on these five appeals is whether the defendants were denied their right to confrontation and to a fair trial when the redacted confessions of two nontestifying defendants were admitted into evidence at their joint trials. I conclude that the confessions were not sufficiently redacted, so that, when coupled with other testimony adduced at trial, those confessions inferentially incriminated the nonconfessing codefendants. With respect to the defendants Farook Khan and Tauqeer Gul, this error was not harmless and their convictions must be reversed.

I

In the early morning hours of January 12, 1990, Deepak Gawri, a grocery store owner and drug dealer, was kidnapped, robbed, and murdered, and his body left slumped over the steering wheel of his car on a deserted street in Queens. Coincidently, a couple of days earlier, the defendant Rehman Sadruddin had begun negotiating the purchase of large quantities of drugs from an individual who, unbeknownst to Sadruddin, was an undercover agent of the Drug Enforcement Administration (DEA). On the morning following the murder, Sadruddin met with the agent, who surreptitiously recorded the meeting. During the course of the meeting, Sadruddin revealed that he had been up all night because he and three accomplices had murdered an "Indian" man who owned a grocery store in Queens. The man had owed one of the participants $5,000 as the result of a drug transaction. Sadruddin elaborated that the perpetrators picked the victim up at his store at approximately 3:00 A.M., drove him to a residential neighborhood in Queens, and shot him. Then they took his day's receipts, $3,000, in partial satisfaction of the

debt. Sadruddin further stated that he drove the getaway van, which he left in a nearby lot. In fact, according to Sadruddin, at 9:00 that morning he had driven by the location where he and his compatriots had left the body and the body was still there. After the meeting the agent notified the Queens Homicide Unit. He subsequently learned that, in fact, the body of an Indian male had been discovered.

On January 16, 1990, the agent, accompanied by another undercover DEA agent, again met with Sadruddin regarding the purchase of drugs. During the course of the meeting, Sadruddin indicated that one of the people who was involved in the murder was interested in purchasing silencers for the guns that had been used. The undercover agents indicated that they could provide the silencers. The next day the agents met with Sadruddin, accompanied by the codefendants Javed Khan and Faisal Saleem. The agents received a 9 millimeter pistol from Javed Khan and a .22 caliber pistol from Saleem to be fitted for silencers. Khan indicated that both weapons had been used recently "to take care of the problem". These defendants were arrested shortly after this last meeting.

## II

After their arrests both Saleem and Sadruddin made statements to the police in which they inculpated themselves and the other defendants in Gawri's murder. The statements named each of the participants, but, as introduced at trial, were redacted so that the names of the codefendants were replaced by neutral pronouns. Saleem and Sadruddin both told the police that the group originally met on Wednesday evening, January 10, 1990. The plan to rob Gawri was supposed to take place on Wednesday, but when they arrived at the store that evening, it was closed. They tried again the next evening, when, according to Saleem, who made both an oral and a written statement, he was in a van with others and was told that they would drive to Gawri's store, where some of them would be dropped off and the others would meet them later at a prearranged location. That evening they went to Gawri's store; then all but one of them left in the van. In the early morning hours they returned to the store. Then, as previously arranged, Saleem and some others left the store and went to the prearranged location in the van. Sometime later Gawri's car arrived at the location. Five to ten minutes after its arrival Saleem heard three shots, and then saw

Zulfigar Ali, who later became the prosecution's principal witness, and another run from the car toward the van. Two others followed, walking. Once they were all in the van they dropped one person off. That person told them all to go to their own homes. Then the van was driven to another location, where all but the driver were let out. The driver brought the van to another location and then met up with the others. Then everyone was driven home.

Sadruddin's statement to law enforcement officials was similar to that of Saleem, but lacking in the detail found in Saleem's statement. Sadruddin admitted driving the van that dropped several persons off at Gawri's store on the evening before the murder. According to Sadruddin, Zulfigar Ali, a clerk, was working in the store. Sadruddin drove the van to the prearranged location. At some point thereafter Gawri's car arrived. Sadruddin told law enforcement officials that the person in the front passenger seat shot Gawri in the head, and that the other participants were in the back seat of Gawri's car. After the shooting, the occupants of Gawri's car got into the van, and the money found in Gawri's pants pocket was divided amongst the participants. After the money was divided Sadruddin parked the van in a parking lot near Queens Boulevard, and the group left on foot.

### III

On February 1, 1990, Rehman Sadruddin, Faisal Saleem, Javed Khan and his brother Farook, Tauqeer Gul, Dinesh Khanna, and Jay Rehan were charged in a multicount indictment with the crimes committed against Gawri, as well as the kidnapping of Zulfigar Ali, a clerk at Gawri's store. Prior to the trial, the defendants moved to sever their trials from those of their confessing codefendants. The trial court denied the severance motions, and redacted the statements of Saleem and Sadruddin, as aforementioned, by replacing the codefendants' names with neutral pronouns. All seven were tried jointly, with Rehan electing to have his fate decided by the court while the other six were tried by the Judge and a jury. Limiting instructions to the effect that the statement made by each perpetrator could only be considered as evidence against the person who made the statement were repeated throughout the trial, as well as in the final charge. Also introduced into evidence at trial were the tapes of the previously described meetings between the DEA agents and Sadruddin, Javed

Khan, and Saleem. The jury was given limiting instructions with respect to this evidence as well.

The principal evidence against the remaining defendants was the testimony of Zulfigar Ali, the clerk, who knew all of the defendants. In fact, Ali had introduced Javed Khan to Sadruddin, a relative of his, and the two became good friends. Ali's testimony essentially served to fill the gaps which were created by the redacted statements of Sadruddin and Saleem. Ali identified each of the defendants who was in the van, and those who rode in the car, and described their roles in the crime. Ali testified that several days before the crime Javed Khan got him a job at the deli owned by the victim, from which groceries and drugs were sold. Although the salary was considerably less than that which Ali had been earning as a cab driver, he accepted the position. The codefendants, Farook Khan and Tauqeer Gul, were also employed there.

Ali testified that he worked from 6:00 A.M. on Thursday, January 11, 1990, until 3:00 the following morning, having covered for Farook Khan, who called in sick. Some time between 7:00 P.M. and 8:00 P.M. the codefendants Rehan and Khanna came into the store, but they left together shortly thereafter. At approximately 11:00 P.M. the Khans and Tauqeer Gul arrived at the store. They were still there at 3:00 A.M., when Gawri and Ali began to close up the store. Ali counted the days' receipts, which totalled about $2,500, and handed the money over to Gawri, who placed it in a brown paper bag which he then put in his pocket. They all stood outside as Gawri and Ali pulled down the shutters, and then Gawri told Ali that he could leave. According to Ali, he was walking toward his car when Farook Khan put a gun to his ribs and directed him to Gawri's car. When they got there Gawri was already seated behind the wheel. Farook Khan got into the front passenger seat, while Javed Khan got into the seat behind Gawri. Gul then pushed Ali into the back seat, and got in after him. Javed Khan also had a gun, which he pointed at Ali. Gul then directed Gawri to drive, and eventually told him where to pull over. Ali looked out the back window and observed the lights of another car. Then he heard a loud gunshot from his left, and he turned to see that Javed Khan had fired his weapon. Farook Khan then fired his gun into Gawri's face. Gul exited the vehicle and ran to a van that was parked behind them. Ali followed him out and ran in the opposite direction, but he was again stopped by Farook Khan, who forced him at gunpoint into the van. Already seated in

the van were Javed Khan, Rehan, Khanna, Gul, Saleem and Sadruddin, who was behind the wheel. They drove to an underground garage, where they all got out and walked Ali home. When they arrived at the house Javed Khan told Ali that they would kill him if he told anyone what happened.

The jury found the Khans guilty of both intentional and felony murder, kidnapping, robbery, and weapons possession. Sadruddin and Saleem, neither of whom had been charged with intentional murder, were found guilty of felony murder, kidnapping, and robbery. Sadruddin was also found guilty of weapons possession. Gul, who also was not charged with intentional murder, was found guilty of felony murder, kidnapping, robbery, and weapons possession. Finally, Khanna was acquitted of felony murder and robbery, but was convicted of the kidnapping of Ali, and has not perfected his appeal. The trial court acquitted Rehan, who elected to be tried without a jury, of all charges.

## IV

The principal issue raised by the appealing defendants is whether their right to confrontation and to a fair trial was violated by the admission into evidence of the redacted confessions of Sadruddin and Saleem, neither of whom testified at the trial. We conclude that the confessions were not sufficiently redacted, so that, when coupled with Zulfigar Ali's testimony, those confessions inferentially incriminated the nonconfessing codefendants. Thus we must reverse the convictions of those defendants with respect to whom we conclude that the error is not harmless, and direct that new trials be held.

## V

In *Bruton v United States* (391 US 123) the United States Supreme Court held that a defendant is denied his constitutional right to confront the witnesses against him when his nontestifying codefendant's incriminating confession is introduced into evidence at their joint trial, even where the jury is instructed that the confession may only be used against the confessor. "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored" *(Bruton v United States,* 391 US, *supra,* at 135). This

and other States recognized as an exception to *Bruton* the situation where the defendant's confession was also introduced into evidence at the joint trial and the statements of the defendant and his codefendant were substantially identical, or interlocked *(see, e.g., People v Cruz,* 66 NY2d 61, 69). However, in *Cruz v New York* (481 US 186), the Supreme Court refused to recognize that exception and extended the holding in *Bruton* to the case where the defendant's own confession, which corroborates the confession of his nontestifying codefendant, is also introduced into evidence, finding that the interlocking nature of the confessions would serve to prejudice the defendant, who, as is usually the case, denies the truth of his or her confession at the trial.

In a case decided on the same day as *Cruz,* however, the Supreme Court held that where the codefendant's statement is redacted to omit any reference to the defendant, and is only inculpatory when linked to other evidence adduced at trial, the risk found by the *Bruton* Court to exist would be substantially lessened *(see, Richardson v Marsh,* 481 US 200). In *Richardson,* two defendants, Marsh and Williams, were tried jointly for the assault of Cynthia Knighton and the murder of two of her family members. A third defendant, Martin, was tried separately. Knighton testified at the joint trial, identifying Marsh, Martin, and Williams as the perpetrators. Also admitted into evidence at the trial was the confession of Williams, which largely corroborated Knighton's testimony. However, the confession was redacted to omit any reference to anyone besides Williams and Martin. The jury was appropriately instructed. The Supreme Court found that the admission of Williams' redacted confession did not violate the dictates of *Bruton,* even though it might have been viewed as inferentially incriminating in light of Knighton's testimony. "We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence [footnote 5]" *(Richardson v Marsh,* 481 US 200, 211, *supra).* In footnote 5 the Supreme Court stated that it was expressing "no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun". It is the situation left unresolved by the *Richardson* Court with which we are now faced.

## VI

The *Cruz* and *Richardson* holdings have served to limit the appropriate use of the confessions of nontestifying codefendants at joint trials. The practice of using neutral pronouns has, however, been approved several times by this Court under circumstances where there were numerous perpetrators, some of whom were not being tried jointly, and the appropriate limiting instructions were given. Thus, in *People v Marcus* (137 AD2d 723), the defendant's conviction for robbery was affirmed where the robbery was committed by five men, four of whom were arrested and three of whom, the defendant, Brown, and Paris, were jointly tried. Paris's postarrest statement, in which he inculpated himself and Brown, was redacted so that references to Brown were replaced by the phrase "another male." The Court upheld the redaction on the basis that the jury could have concluded that the other male was Brown or the unapprehended perpetrator. "Thus, under the circumstances of this case and in light of the court's clear and unequivocal instructions, it is unlikely that the jury would have inferred that the phrase 'another [male]' implicated the defendant" (*People v Marcus, supra,* at 723). Similarly, the evidence adduced in *People v Sutter* (162 AD2d 644) indicated that at least 12 individuals participated in the racially motivated attack on the three victims for which the defendant was convicted. Thus, this Court held that the admission of the videotaped statement of the codefendant, which was redacted so that the accomplices were referred to only as "my friend", "they", or "three guys", did not violate the defendant's right to confrontation, as it was neither facially nor inferentially incriminating.

The distinction between cases where a *Bruton/Cruz* violation was found to exist and those cases just discussed was most recently explained by Presiding Justice Mangano in *People v Hussain* (165 AD2d 538). The confession admitted into evidence in *Hussain* omitted reference to the defendant by name, but referred to the other individual involved as the confessor's "cousin". When combined with the testimony of an undercover officer, it was clear that the person to whom the confessor referred was the defendant. The *Hussain* Court rejected the prosecution's contention that the use of neutral pronouns served to obviate any potential Confrontation Clause violation. "It is true that, subsequent to the United States [Supreme] Court decision in *Richardson v Marsh* (481 US 200,

*supra),* this court has rejected similar arguments by other defendants. However, in all of those cases, there was testimony adduced which indicated that numerous other individuals participated in the crimes charged. Therefore, the neutral terms used in the redacted confessions of the codefendants in those cases would not have been understood by the juries involved as inculpating the defendants therein" *(People v Hussain, supra,* at 542). The Court found that not to be the case in *Hussain,* where, when combined with other testimony, the jury could not help but conclude that the "cousin" referred to in the codefendant's statement was the defendant.

## VII

Here, too, the use of neutral pronouns was simply insufficient to protect the nonconfessing defendants against "the practical and human limitations of the jury system" *(Bruton v United States,* 391 US 123, 135, *supra).* Although there were several perpetrators involved here, *all of them were identified by the eyewitness, Ali,* and all were tried jointly. In light of the manner in which the statements of the confessing codefendants tracked the testimony of the eyewitness, the redaction employed simply did not eliminate all reference to the nonconfessing defendants *(see, Richardson v Marsh,* 481 US 200, *supra),* and presented too great a risk that the jury would not or could not follow the court's limiting instructions, and that they would simply fill in the blanks found in the confessions with the eyewitness's testimony *(see, Bruton v United States, supra,* at 135). Somewhat telling in this regard is the fact that the defendant who was tried jointly but whose fate was decided by the court, as opposed to the jury, was acquitted of all charges.

In this way the case at bar is not much different than that of *People v Wheeler* (62 NY2d 867), which was heavily relied upon in *Hussain.* There the defendant and his brother, who had made a statement inculpating himself and the defendant, were jointly tried. The brother's statement was redacted in such a way that any references to what he and the defendant did were replaced by the neutral pronoun "we" or by "I". The Court of Appeals concluded that this redaction was insufficient to eliminate prejudice to the defendant, even though there had been some testimony to the effect that a third person may have been involved. "The possibility that the jury may have viewed the incriminating references [as references to a third

person] is insufficient to eliminate the prejudice to defendant from the use of this statement upon his trial. Given that the two brothers were being tried for the crime together, we believe the confession could only be read by the jury as inculpating defendant" *(People v Wheeler, supra,* at 869).

Any reliance on *People v Johnson* (162 AD2d 620) is misplaced. There this Court affirmed the defendant's conviction where the nontestifying codefendant's statement was redacted to avoid any reference to the defendant, but was deemed incriminating only when linked with evidence introduced at a later stage of trial. The Court, relying on *Richardson v Marsh* (481 US 200, *supra),* concluded that "the necessity of such linkage minimized the probability that the jury would be unable to disregard incriminating inferences thereby overcoming the concern expressed by the *Bruton* court" *(People v Johnson,* 162 AD2d, *supra,* at 620-621). In contrast, while the statements at bar were redacted to avoid any references to the other defendants by name, they disclose that the perpetrators met the day before to plan the robbery and they track the testimony of the one eyewitness to the murder with such precision that the inability of the jury to disregard incriminating inferences simply cannot be minimized. Thus, they were not effectively redacted, and their use at the joint trial deprived the nonconfessing defendants of their right to confront the witnesses against them.

## VIII

Having found that the introduction of the inculpatory statements of the defendants Sadruddin and Saleem at the joint trial was erroneous, we must determine whether that error is harmless with respect to some or all of the defendants. A constitutional error, such as that present on these appeals, may be deemed harmless only if it is determined that there is overwhelming proof of the defendant's guilt and no reasonable possibility that the error might have contributed to the defendant's conviction, and is, therefore, harmless beyond a reasonable doubt *(see, People v Crimmins,* 36 NY2d 230, 237; *People v Vargas,* 143 AD2d 699, 701). "When considering harmless error in a *Bruton* case, the court must determine on the basis of its own reading of the record the probable impact of the codefendant's admissions on the 'minds of an average jury' and whether they were sufficiently prejudicial to defendant to require reversal of the conviction and a new trial *(see, Har-*

*rington v California,* 395 US 250, 254)" *(People v Hamlin,* 71 NY2d 750, 758).

### Tauqeer Gul and Farook Khan

The only evidence adduced at trial against Tauqeer Gul and Farook Khan was the testimony of Ali. Ali gave an eyewitness account of the crimes in which he identified Farook Khan as one of the shooters and Gul as an active participant in both the underlying felonies and the murder. However, Ali's credibility was repeatedly challenged by defense counsel during the course of the trial. Ali's job at the deli was procured for him only a few days before the crime by one of the perpetrators and at a salary which was considerably less than that which he had been earning as a cab driver. According to Ali's own testimony, on the night of the crime he had left the store before any criminal activity occurred, but was inexplicably brought back to the scene by one of the participants, thereby becoming an eyewitness to the events. Once having witnessed what can at most be characterized as events leading up to a robbery, Ali was kidnapped and brought along to witness a murder, supposedly so that he would not tell law enforcement authorities about the robbery. This explanation of his presence at the scenes of the kidnapping and of the murder is lacking in logic, and casts a pall of incredulity over Ali's testimony. Finally, when first interviewed by the police Ali denied all knowledge of the incident in question. The statement which formed the basis of Ali's trial testimony was made only after he had been summoned to the station house by the police a second time, and then only after he saw Sadruddin there under arrest. Thus the evidence adduced against Gul and Farook Khan was far from overwhelming, and the probable impact of the admissions of Saleem and Sadruddin on the minds of the average juror was to prejudice them. Their convictions must be reversed and a new trial ordered *(see, People v Hamlin, supra).*

### Javed Khan, Rehman Sadruddin, and Faisal Saleem

The situation with respect to Javed Khan and the two confessing codefendants, Saleem and Sadruddin, is markedly different. In addition to Ali's incriminating testimony, which was corroborated by Saleem's statement, the DEA agent testified that Sadruddin gave him a description of the crime and his participation therein. Presumably, at the time of this

conversation the agent was unaware that the crime had been committed, as Sadruddin indicated that he had driven by the scene of the murder that morning and Gawri's body was still in the car. The agent's further testimony established that Sadruddin, Saleem, and Javed Khan brought him two guns that they wished to have equipped with silencers. During the meeting Javed Khan, in the presence of Saleem, told another DEA agent, in response to the agent's remark that the guns looked as though they could not kill anybody, that they had recently been used to take care of a problem. Ballistics tests subsequently established that those guns were the weapons used to kill Gawri. Additionally, at his arraignment Javed Khan stated that he and Ali, acting in self-defense, were responsible for Gawri's death. At the trial, Javed Khan testified on his own behalf that he and Ali shot Gawri after Gawri pulled a gun on him. The incident, according to Javed, was a consequence of Gawri's consternation at Javed's request to be repaid the money loaned. Javed Khan was also identified by a gun store owner from Georgia as the purchaser of a gun of the same make and model as one of the guns which he and Saleem had turned over to the DEA agents.

Of course, in addition to all of the foregoing is the testimony as to the incriminating statements made by Sadruddin and Saleem to law enforcement authorities, each of which is admissible against the confessing defendant and "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless, see *Harrington* v. *California,* 395 U.S. 250 (1969)" *(Cruz v New York,* 481 US 186, 194, *supra).* Moreover, although Saleem and Sadruddin each argue that the admission of the other's confession cannot be deemed harmless, there was sufficient independent evidence against each, and the detailed confessions themselves were sufficiently dissimilar, that on this record we conclude that the admission of one's confession was not sufficiently prejudicial to the other so as to require reversal of either's conviction *(see, People v Hamlin,* 71 NY2d 750, 758, *supra; see also, People v Faust,* 73 NY2d 828).

## IX

In light of the foregoing, the convictions of Farook Khan and Tauqeer Gul must be reversed as having been obtained in violation of their constitutional right to confrontation, and a new trial ordered. As to Javed Khan, Rehman Sadruddin, and

Faisal Saleem, the error was harmless beyond a reasonable doubt, and thus their convictions are affirmed.

THOMPSON, J. P., SANTUCCI and JOY, JJ., concur.

Ordered that the judgment against Farook Khan is reversed, on the law, and a new trial is ordered; the facts have been considered and determined to have been established; and it is further,

Ordered that the judgment against Tauqeer Gul is reversed, on the law, and a new trial is ordered; the facts have been considered and determined to have been established; and it is further,

Ordered that the judgment against Rehman Sadruddin is affirmed; and it is further,

Ordered that the judgment against Javed Khan is affirmed; and it is further,

Ordered that the judgment against Faisal Saleem is affirmed.