33 F.3d 53
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kevin MARTIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Anthony CAIN, Defendant-Appellant.
 Nos. 94-5013, 94-5014.
 United States Court of Appeals, Fourth Circuit.
 Aug. 22, 1994.
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Huntington. Robert J. Staker, District Judge. (CR-93-95-3)
 C. Cooper Fulton, Assistant Federal Public Defender, Charleston, WV; John Harold Laishley, Huntington, WV for Appellants.
 Paul Thomas Farrell, Assistant United States Attorney, Huntington, WV, for Appellee.
 Hunt L. Charach, Federal Public Defender, Charleston, WV, for Appellants. Rebecca A. Betts, United States Attorney, Huntington, WV, for Appellee.
 S.D.W.Va.
 AFFIRMED.
 Before WIDENER, HALL, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Kevin Martin and David Anthony Cain appeal their convictions for conspiracy to distribute crack, possession of crack with intent to distribute, and carrying or using a firearm during and in relation to a drug trafficking offense.[1] We find no reversible error, and we affirm.
 
 I.
 
 2
 On April 16, 1993, members of the Huntington Federal Drug Task Force conducted a "dynamic entry" at the home of Marshall Graves and Darlene Johnson in Huntington, West Virginia. Among the items that the Task Force discovered were 88.4 grams of crack, over $1,400 in marked and unmarked currency, three firearms (a loaded .38 revolver, a loaded .380 semi-automatic pistol, and a 9mm Tech machine pistol with a loaded magazine nearby), and extra ammunition for the .380 and the Tech 9. The police found some of the drugs and all of the currency in a bedroom closet--where they also found Martin and Cain.[2]
 
 
 3
 The two were arrested, and Special Agent Sullivan of the FBI took Martin outside and placed him in Sullivan's vehicle. After giving him a version of the Miranda[3] warnings, Sullivan asked Martin whether he wanted to talk. Martin told Sullivan that he and Cain had traveled to Huntington from Columbus, Ohio, twice previously in the preceding two to three weeks, and that on the second occasion (as well as on the day of his arrest) they had brought crack from Columbus to sell in Huntington. Martin said that he and Cain operated out of the Graves/Johnson house, and that they employed Graves, Johnson, and a man named Jay to sell the crack locally.
 
 
 4
 The district court scheduled Martin and Cain to be tried together. At a pretrial hearing, Martin moved to suppress the statement that he gave to Sullivan on the ground that he had not voluntarily waived his right to remain silent. Cain, aware that Martin's statement had implicated him and anticipating that Martin would not take the stand, moved for severance. The court denied both motions. However, in ruling on the motion to sever, the court instructed the government that Agent Sullivan, when testifying regarding Martin's statement, could not refer to any mention of Cain by Martin.
 
 
 5
 During voir dire, one of the venirepersons, John Patterson, revealed that he was acquainted with Assistant United States Attorney Paul Farrell, lead counsel for the government. The two had attended the same boarding school in Kentucky approximately thirty years earlier (although they apparently did not know each other at the time), and, in 1979-80, Farrell had served as an officer of the bank where Patterson worked. In addition, the two had belonged to the same church and their children had occasionally played together on the same organized sports teams. The court asked Patterson whether he could render a fair and impartial verdict; Patterson responded that he could. The court denied Martin and Cain's challenge of Patterson for cause. They then used a peremptory strike to remove him from the jury.
 
 
 6
 At trial, Officer Akers of the Huntington Police Department testified regarding the personal effects that he had seized from Cain following his arrest. The items--a calculator and a small amount of cash--had been inventoried, placed in a plastic bag, and sealed pending trial. When the bag was opened at trial, it also contained a small card case that had not been inventoried. The case was filled with various business cards and Cain's Ohio driver's license, which stated that he lived in Columbus. The government, apparently previously unaware that the case had been seized, sought to introduce the license into evidence. The district court admitted the license over Cain's objection that it had not been specifically disclosed as an exhibit prior to trial.
 
 
 7
 Agent Sullivan testified regarding Martin's statement; as instructed, Sullivan did not mention Cain. Cain did not request, and the court did not give, an instruction cautioning the jury not to consider Martin's statement as evidence of Cain's guilt. The rest of the evidence against the two consisted of the testimony of informers and others who had struck plea bargains, as well as the considerable physical evidence seized at the crime scene. The jury convicted Martin and Cain on all three counts, and the district court sentenced each to 121 months in prison on the drug conspiracy and possession counts, with 60 months tacked on for the firearms count. Both men appeal their convictions.
 
 II.
 
 8
 Martin assigns as error the district court's admission into evidence of Martin's post-arrest statement to Sullivan. At the September 24 hearing, Agent Sullivan testified regarding the episode:
 
 
 9
 Q. [D]id you interview Mr. Martin?
 
 
 10
 A. Yes, I did.
 
 
 11
 Q. Where did that interview take place?
 
 
 12
 A. In a vehicle outside the residence.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 Q. And did you give him what's traditionally called the Miranda warning?
 
 
 16
 A. Yes, I did.
 
 
 17
 [DEFENSE COUNSEL]: Objection, Your Honor. He's leading on a critical area.
 
 
 18
 Q. Did you advise him of his rights?
 
 
 19
 A. Yes, I did.
 
 
 20
 THE COURT: Overruled.
 
 
 21
 Q. What did you tell Mr. Martin?
 
 
 22
 A. I said he had the right to remain silent; anything he said can and will be used against him in a court of law; he has the right to have an attorney present; he can stop at any time until an attorney is present; did he understand those rights.
 
 
 23
 Q. And what was Mr. Martin's response?
 
 
 24
 A. He said yes, he did.
 
 
 25
 Q. And did you then conduct an interview?
 
 
 26
 A. Yes, I did.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Q. And during that, he stated that he had in fact dealt drugs here in Huntington?
 
 
 30
 A. Correct.
 
 
 31
 Q. And at any time did he ask you to stop questioning him?
 
 
 32
 A. No.
 
 
 33
 Q. At any time did he ask for an attorney?
 
 
 34
 A. No.
 
 
 35
 Q. At any time did he refuse to answer any questions?
 
 
 36
 A. No.
 
 
 37
 Q. Was anybody else present when you advised him of his Miranda warning?
 
 
 38
 A. Special Agent Arthur Turner.
 
 
 39
 Turner did not testify at the hearing. On cross-examination, defense counsel elicited that Agent Sullivan may have told Martin that cooperating would inure to his benefit in the long run; Sullivan also admitted that Martin had signed no waiver form. At the close of Sullivan's testimony, counsel argued to the district court that Martin had not voluntarily waived his right to remain silent. The court disagreed, stating that
 
 
 40
 There is no evidence whatever that the government did not give this defendant his Miranda rights and that he understood them before he made any statement, oral statement, to Officer [sic] Sullivan, and indeed the evidence is to the contrary. As to ... Sullivan saying that if [Martin] made a statement, he may be able to help himself, I do not believe that that is a false statement. No promises were made to him.
 
 
 41
 Until this appeal, apparently no one had noticed that Agent Sullivan did not specifically state in his direct testimony that he had informed Martin that, if Martin was indigent, an attorney would be appointed to represent him.
 
 
 42
 Because Martin argued to the district court only that he had not voluntarily waived his Miranda rights, we review for plain error his newly discovered challenge to the sufficiency of the warnings. See Fed.R.Crim.P.52(b). Initially, we must find (1) error that is (2) plain and (3) affects substantial rights. United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993). If the first three Olano factors are present, we will correct the error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 1779.
 
 
 43
 We will assume that Agent Sullivan's Miranda warnings were insufficient, and that the district court should have recognized the error and suppressed Martin's uncounseled statement. Even so, Mar tin still bears the burden of showing that the error affected a substantial right, which "in most cases ... means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." Id. at 1778 (citations omitted). In light of the other, overwhelming evidence before the jury of Martin's guilt, he cannot show that he was prejudiced by the district court's failure to suppress the statement; hence, admitting the statement into evidence was not plain error.[4]
 
 III.
 
 44
 We turn now to Cain, who alleges that the district court erred by admitting his driver's license into evidence. Cain also maintains that the court committed plain error when it failed to caution the jury, sua sponte, that it was not to consider Martin's statement as evidence of Cain's guilt.
 
 A.
 
 45
 There is no indication in the record that the police intentionally omitted the card case containing the driver's license from their inventory of Cain's personal effects seized during his arrest. In addition, there is no evidence that the government had actual knowledge of the license's existence or intentionally violated the discovery rules; in fact, every inference leads to the contrary conclusion. As soon as it became apparent that its exhibit did not conform to the inventory, the government requested a sidebar conference and the court called a recess to discuss the problem. Contrary to Cain's assertions, the government's actions appear to have strictly complied with Fed.R.Crim.P.16(c).[5] Cain nevertheless claims that he was prejudiced by the government's failure to disclose the license earlier because, had he known that the government could tie him to Martin's hometown, he would have accepted a plea bargain. In essence, Cain asks us to believe (1) that he did not know that he was carrying his driver's license when the police arrested him, (2) that the government could not have otherwise proven his residence, (3) that, but for the foregoing, he would have accepted a plea bargain, and (4) that proof of his residence was necessary to establish that he conspired with Martin to deliver crack. We decline to engage in such unfounded speculation, and we reject Cain's argument.
 
 B.
 
 46
 We are similarly unimpressed by Cain's contention that the court erred by failing to caution the jury upon admitting Martin's redacted statement into evidence. Because Cain did not request such an instruction, our review is once again limited to plain error.
 
 
 47
 It is, perhaps, arguable that the district court erred by not giving such an instruction on its own initiative.[6] However, the otherwise abundant evidence against Cain precludes him from demonstrating the level of prejudice sufficient to satisfy the third Olano factor. See Part II, supra.
 
 IV.
 
 48
 Both defendants contend that the district court erroneously refused to give a "buyer-seller" instruction to the jury. The requested instruction stated that
 
 
 49
 The mere sale or distribution of drugs from one person to another is not a conspiracy to distribute drugs. That is, a conspiracy requires more than a simple buyer-seller relationship and a seller does not become a member of a conspiracy to distribute drugs merely by completing the transaction.
 
 
 50
 We have held previously that it is not error for a district court to refuse to give such an instruction where the evidence reveals that the relationship between the alleged conspirators goes beyond that of a mere buy-sell transaction. United States v. Mills, 995 F.2d 480, 485 (4th Cir.), cert. denied, 114 S.Ct. 283 (1993).
 
 
 51
 In the case at bar, the undisputed evidence revealed that the police discovered both Martin and Cain hiding in the same closet at the Graves/Johnson residence. In addition, James Jackson testified regarding an incident where Graves and Johnson sought refuge in his home because Graves believed that Martin was going to kill him over a drug debt. On that occasion, Martin, accompanied by Cain, forced his way past Jackson's wife into the home and struck Graves with a pistol while simultaneously threatening to shoot him. When Johnson (who was pregnant) protested, Cain threatened to "beat that baby" out of her if she did not shut up. Cain then placed a long distance phone call from Jackson's house, and told the person on the other end of the line that they would not be able to make it home because they had some business to take care of in Huntington.
 
 
 52
 In short, there was an abundance of evidence that the relationship between Martin and Cain was more than just that of buyer and seller. In fact, the evidence was so strong that the defendant's proffered instruction may only have served to confuse, rather than enlighten, the jury. Thus, under Mills, the district court was well within its discretion to refuse to give it.
 
 
 53
 Finally, both defendants claim that the district court violated their right to an impartial jury by forcing them to use a peremptory challenge to strike Patterson. The law is not on their side. See Ross v. Oklahoma, 487 U.S. 81, 88 (1988) ("[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated.") (emphasis supplied).
 
 
 54
 We have examined the defendants' contentions, and we find them to be without merit. Accordingly, we affirm their convictions.
 
 AFFIRMED
 
 
 [1]
 In violation of, respectively, 21 U.S.C. Secs. 846 and 841(a)(1), and 18 U.S.C. Sec. 924(c)
 
 
 [2]
 Each man had some of the marked currency on his person. In addition, a baggie containing crack was found in a pocket of Martin's trousers
 
 
 [3]
 Miranda v. Arizona, 384 U.S. 436 (1966). See Section II, infra
 
 
 [4]
 Though we agree with the district court that Martin knowingly and voluntarily waived his Miranda rights prior to answering any of Agent Sullivan's questions, the quantum of other evidence against Martin convinces us that, even if admitting the statement was error, it was harmless. See Fed.R.Crim.P.52(a)
 
 
 [5]
 Rule 16(c) states that "[i]f, prior to or during trial, a party discovers additional evidence or material previously requested or ordered ... such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material."
 
 
 [6]
 In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held, inter alia, that a cautionary instruction cannot cure the harm to a defendant's Sixth Amendment rights that occurs when a nontestifying codefendant's statement inculpating both is admitted into evidence. The Court clarified the Bruton rule somewhat in Richardson v. Marsh, 481 U.S. 200 (1987). In Richardson, the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211 (emphasis supplied). Though Cain urges that the above quote requires a cautionary instruction whenever a statement is redacted to comply with Bruton, we do not believe that the issue was squarely before the Court in Richardson