SMITH, Circuit Judge,
dissenting.
I agree that the majority has employed the correct legal standard in their determination that Bruton v. United States, 891 U.S. 128, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) and Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) were “clearly established federal law” when the Pennsylvania Superior Court (the “Superior Court”) rejected Naree Abdullah’s Sixth Amendment confrontation claim on direct appeal.[1] However, I disagree with my colleagues in their legal analysis — most notably, their determination that the Superior Court did not unreasonably apply the Bru-ton line of cases (Gray in particular) in violation of Abdullah’s Sixth Amendment rights. Because I do not view this error as harmless, I would grant Abdullah’s petition for habeas relief.
I
I supplement the majority’s recitation of the facts in several respects.
As set forth in the majority opinion, a joint trial of five codefendants — Abdullah, Eric Greene (a/k/a Jermaine Trice), Gregory Womack, Julius Jenkins, and Atil Fin-ney — was held related to the 1993 robbery and murder at Lilly’s Market in north Philadelphia. Neither Finney nor Wom-ack testified at trial. Nonetheless, the Commonwealth sought to introduce statements by Finney and Womack regarding the robbery and murder at Lilly’s Market. Those statements were redacted to omit references to the names of any of their co-defendants (collectively, the “Redacted Statements”).
Detective Michael Gross of the Philadelphia Police Department read Finney’s redacted statement into the record. When Detective Gross reached a portion of the redacted statement where Finney was asked to identify the full names of the individuals who participated in the robbery and murder, the redaction simply deleted the names or changed the names to the word “blank.” The redacted statement read into the record at trial included:
QUESTION: Do you know any of these guys by their full names?
ANSWER: One is and the other is. I only know two of them by their nicknames.
QUESTION: Detective Worrell is going to show you some photos. Tell us if you recognize anyone.
ANSWER: Number three is. Number six is. Number eight is.
QUESTION: Do you know a guy named blank?
ANSWER: I know a blank.
*138 QUESTION: Can you identify this picture?
ANSWER: Yes. That’s him.
Identified photo number of photo of blank.
Finney’s redacted statement also replaced the names of certain individuals with the word “blank” on four other occasions.
Detective Joseph Walsh of the Philadelphia Police Department read Womack’s redacted statement into the record. This redacted statement also replaced names of individuals identified by Womack with the word “blank” and “someone.” This redacted statement included the following:
QUESTION: Do you know who shot and killed Francisco Azcona?
ANSWER: Yes.
QUESTION: What is his last name and where does he live?
ANSWER: His name is blank. He used to live on top of the bar.
QUESTION: Do you know someone’s real name and where he lives?
ANSWER: I don’t know his real name. He lives somewhere on blank.
QUESTION: Do you know someone else’s real name and where he lives?
ANSWER: We call him blank. I don’t know where he lives. Somewhere in dog down [sic].
QUESTION: What is someone else’s real name and where does he live?
ANSWER: I don’t know his real name, but when we were locked up he used blank.
II.
A.
Federal habeas relief may be granted pursuant to 28 U.S.C. § 2254(d) where the state court’s decision “involved an unreasonable application of’ clearly established federal law as determined by the Supreme Court. When determining whether a state court’s application of federal law was unreasonable under § 2254(d), the “state prisoner must show that the state court’s ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011). In my view, the Superior Court unreasonably applied the Bruton line of eases, most notably Gray.
In Gray, three men — Anthony Bell, Kevin Gray, and Jacquin Vanlanding-ham — allegedly participated in the fatal beating of the victim. See Gray, 523 U.S. at 188, 118 S.Ct. 1151. Bell confessed to the crime, and in that confession he implicated both Gray and Vanlandingham. See id. Vanlandingham died prior to trial. See id. Bell and Gray were tried jointly, and Bell did not testify. See, e.g., id. at 188-89, 118 S.Ct. 1151. The trial court permitted Bell’s confession to be read into evidence on the condition that it was redacted to remove the names of both Gray and Vanlandingham. See id. at 188, 118 S.Ct. 1151. A police detective read the confession into evidence, replacing the names of Gray and Vanlandingham with the word “deleted” or “deletion.” See id. For example, a portion of the redacted statement at issue in Gray read: “Question: Who was in the group that beat Stacey[.] Answer: Me, deleted, deleted, and a few other guys.” Id. at 197, 118 S.Ct. 1151. The Supreme Court held that such redactions violated Bruton because they were “obvious indications of alteration” that “leave statements that, considered as a class, so closely resemble Bru-ton’s unredacted statements that ... the *139 law must require the same result.” See id. at 192,118 S.Ct. 1151.
In so holding, the Supreme Court noted that “a jury will often react similarly to an unredacted confession and a confession redacted [by obvious alterations] for the jury will often realize that the confession refers specifically to the defendant.” See id. at 193,118 S.Ct. 1151. The Court stated that “this is true even when the State does not blatantly link the defendant to the deleted name” because obvious deletions may overemphasize the importance of the confession’s accusation, call the juror’s attention to the removed name, and encourage the jury to speculate about the reference. Id. The Court further noted that the use of obvious redactions as a substitute for code-fendant names is impermissible under Bruton even where those redactions do not clearly refer to a particular defendant, such as where the confession uses two or more blanks even though only one other defendant is on trial or where the trial indicates that there are more participants than the confession has named. Id. at 194-95,118 S.Ct. 1151.
Here, the Redacted Statements that were read into the record at trial contained obvious redactions of names, including the use of deletions and the word “blank.” Thus, it is clear that the Redacted Statements fall squarely within the class of statements protected by Gray and Bruton. See, e.g., Gray, 523 U.S. at 197, 118 S.Ct. 1151.
The majority concludes that “[t]he conflicting statements from [Demond] Jackson, Finney, and Womack, along with Mrs. Azcona’s testimony, cast doubt upon the number of individuals present at the scene of the crime and, correspondingly, upon the assertion that Womack’s and Finney’s redacted confessions gave rise to an immediate inference that Abdullah was among the individuals who robbed Lilly’s Market and murdered Azcona.” Gray’s plain language, however, is at odds with the majority’s conclusion:
We concede certain differences between Bruton and this case. A confession that uses a blank or the word “delete” (or, for that matter, a first name or a nickname) less obviously refers to the defendant than a confession that uses the defendant’s full and proper name. Moreover, in some instances the person to whom the blank refers may not be clear: Although the followup question asked by the State in this case eliminated all doubt, the reference might not be transparent in other cases in which a confession, like the present confession, uses two (or more) blanks, even though only one other defendant appears at trial, and in which the trial indicates that there are more participants than the confession has named. Nonetheless, as we have said, we believe that, considered as a class, redactions that replace a proper name with an obvious blank, the word “delete,” a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton’s unredacted confessions as to warrant the same legal results.
Gray, 523 U.S. at 194-95, 118 S.Ct. 1151 (emphasis added).[2]
*140 The majority has also overlooked the inherently speculative danger caused by obvious redactions. For instance, in Fin-ney’s statement, the detective laid a photo array before Finney and asked him to identify the individuals. Finney then identified four of the individuals depicted in the array, and the trial court redacted the statement to delete three of the names and substituted the word “blank” for the fourth name. The jury’s likely natural and immediate inference upon hearing Fin-ney’s redacted statement was that Finney identified his four codefendants. However, Finney’s unredacted statement demonstrates that Finney identified only some of his codefendants in the photo array. In particular, Finney named “Quad” (a/k/a Greene), “Man” (a/k/a Womack), and two other non-codefendants. That Finney did not name Abdullah in the photo array is beside the point because the natural inference to be drawn was that Abdullah’s name was likely among those redacted. Despite this, Abdullah could not confront Finney at trial, and thus, Abdullah’s Sixth Amendment rights were violated.[3]
Moreover, contrary to the majority’s assertion, I am not suggesting that Gray sub silentio overruled Richardson. As Gray acknowledges, “Richardson placed outside the scope of Bruton’s rule those statements that incriminate inferentially,” and that the jury “must use inference to connect the statement in [a] redacted confession with the defendant.” Id. at 195, 118 S.Ct. 1151. However, Gray went on to state that just because a jury must draw an inference does not mean that the statement falls within Richardson. See id. Otherwise, Richardson would also place outside Bruton’s scope confessions that used shortened first names, nicknames, unique descriptions, and perhaps even a defendant’s full name if that defendant is generally known by a nickname. See id. Thus, Gray reasoned that
Richardson must depend in significant part upon the kind of, not the simple fact of, inference. Richardson’s inferences involved statements that did not refer directly to the defendant himself and which became incriminating only when linked with evidence introduced later at trial. The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.
Id. at 196, 118 S.Ct. 1151 (quotation marks and citations omitted). Gray continued, *141 noting that because a jury can draw immediate inferences, a “redacted confession with the blank prominent on its face, in Richardson’s words, ‘facially incriminates]’ the codefendant.” Id. (emphasis added). In other words, Gray does not purport to overrule Richardson, and I do not suggest otherwise; instead, Gray expressly acknowledges that its circumstances — i.e., the introduction of a nontes-tifying defendant’s statement that contains obvious redactions — is a different kind of inference than what was at issue in Richardson and that such statements facially incriminate codefendants. Thus, much as Gray expressly found that Richardson did not control the result there, Id. at 195, 118 S.Ct. 1151, it likewise does not control the result here.
In sum, the Superior Court’s decision— by ignoring the express, unequivocal language in Gray as discussed supra — was “so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 131 S.Ct. at 786-87. Accordingly, I conclude that the Superior Court unreasonably applied the Bruton line of cases, particularly Gray.
B.
I am also not persuaded by the Commonwealth’s argument that the introductions of the improperly redacted statements by Finney and Womack were harmless. In a harmless error analysis, we examine whether the alleged constitutional error “had substantial and injurious effect or influence in determining the jury’s verdict.” Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted); see Fry v. Pliler, 551 U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that the Brecht standard applies to all constitutional errors by a state court under collateral review).
Here, Jackson, who was the Commonwealth’s star eyewitness, testified that: he was present in the station wagon with Defendants on the night of the robbery; he observed Abdullah, Finney, Greene, and Jenkins enter Lilly’s Market; Defendants returned to the car with the cash register; and they all went to Abdullah’s house where Defendants divided the robbery’s proceeds. However, Jackson’s credibility was highly questionable. At the time that Jackson gave his initial statement to the police implicating Defendants in the robbery, Jackson himself was a target of the robbery investigation, and thus had every incentive to point the finger of blame in another direction. Ultimately, despite Jackson’s presence both in Wom-ack’s ear during the robbery and at the location where Defendants divided the stolen money, the Commonwealth did not charge Jackson for any crimes associated with the robbery.
Further, Jackson was facing three pending state drug charges — two charges for possession and one for possession with intent to distribute — at the time he testified against Abdullah. Jackson may have hoped to ingratiate himself with the Commonwealth and obtain leniency as to his pending drug charges by testifying against Defendants. Finally, Jackson’s testimony included several significant discrepancies compared to an earlier statement he gave to the police. For example, contrary to his earlier statement that Abdullah carried the cash register from Lilly’s Market, Jackson testified that Greene took the cash register from the store. Jackson also testified that all of the occupants of the station wagon, except for him and Womack, entered the store. This directly contradicted his earlier statement that Greene remained in the car with him and Womack. In short, Jack *142 son’s eyewitness testimony was highly suspect.[4]
Moreover, Fancisco Azcona’s wife and Keenan Roach were the only other eyewitnesses who were offered by the Commonwealth against Abdullah. Azcona’s wife testified that, on December 11, 1993, three or four men entered Lilly’s Market, robbed the store, and one of the men shot and killed her husband. Roach testified that, at the time of the robbery, he saw four men in the vicinity of Lilly’s Market and that one man was carrying a cash register while another man was holding a revolver. Neither of these eyewitnesses, however, could identify Abdullah or any of the other Defendants as perpetrators of the robbery.
In addition to the eyewitness testimony, the Commonwealth also introduced the testimony of Police Officer Mitchell McKeever. McKeever testified that on December 14, 1993, a few days after the robbery and murder at Lilly’s Market, he witnessed Jenkins, Womack, Greene, and Abdullah walking near 29th and York Street in Philadelphia. McKeever testified that Jenkins was carrying a handgun and that the four men entered Ace Check Cashing Agency (“Ace”). After a few minutes, McKeever saw the men exit Ace and walk to a station wagon. McKeever testified that he arrested Jenkins and recovered the handgun. Officer John Finor, an expert in firearms identification, testified that the handgun fired the bullet recovered from the scene of Mr. Azcona’s murder. Even if, as the majority asserts, this testimony evidences Abdullah’s relationship to the other codefendants and their access to the murder weapon, this after-the-fact evidence offered to show that Ab-dullah participated in the Lilly’s Market robbery is, at best, highly circumstantial.
The Commonwealth presented no fingerprints or other physical evidence linking Abdullah to the crime scene. Other than Jackson’s suspect testimony, the only direct pieces of evidence tying Ab-dullah to the robbery were the Redacted Statements, which were improperly admitted into evidence against Abdullah. Given the lack of physical evidence tying Abdullah to the crime scene, Jackson’s credibility issues, the inability of the other eyewitnesses to identify Abdullah, and the circumstantial nature of McKeever’s testimony — the Commonwealth’s ease against Abdullah was shaky. In fact, the Redacted Statements may well have been the most damning pieces of evidence the Commonwealth introduced against Abdul-lah. See, e.g., Bruton, 391 U.S. at 135, 88 S.Ct. 1620 (recognizing that the statements of a non-testifying codefendant that incriminate the defendant are so powerful and devastating to the defendant that not even limiting instructions, and the attendant presumption that the jury follows those instructions, can overcome the violation). Thus, the introduction of the Redacted Statements could only have had a substantial and injurious effect on the jury’s decision to convict Abdullah.
I simply do not see how the erroneous admission of the Redacted Statements against Abdullah can be viewed as harmless.
*143 III.
For the reasons set forth above, I would grant Abdullah’s petition for habeas relief. I respectfully dissent.

. In Greene v. Palakovich, we decided that Greene, one of Abdullah's codefendants, could not rely on Gray because Gray was not clearly established law under AEDPA at the time that Greene’s relevant state-court decision was issued. 606 F.3d 85, 95, 99 (3d Cir.2010), aff'd sub nom. Greene v. Fisher, -U.S.-, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011). That is, the Supreme Court did not issue Gray until after the Superior Court’s decision on Greene's direct appeal.
In Abdullah's case, however, Gray was clearly established law under AEDPA at the time of Abdullah’s relevant state-court decision. The Supreme Court issued Gray on March 9, 1998, prior to the Pennsylvania Superior Court’s June 12, 2001 decision on Ab-dullah’s direct appeal. Consequently, Gray is applicable to the instant matter.

. To the extent the majority relies on Priester v. Vaughn, 382 F.3d 394 (3d Cir.2004) for the proposition that the Sixth Amendment is satisfied "[a]s long as the deletions do not give rise to a direct and immediate inference that the petitioner is the person referred to in the blanks," I view that case as inapposite. It did not involve obvious deletions of names from a non-testifying codefendant’s statement. See id. at 400-01 (redacting a codefendant's statement by replacing names with generic phrases such as "the other guy” or "another guy”). In fact, Priester expressly stated that its circumstances do not implicate the concerns dis *140 cussed in Gray, such as that " ‘an obvious blank will not likely fool anyone,' ‘the obvious deletion may well call the jurors' attention specially to the removed name,’ and that 'a blank or some other similarly obvious alteration’ are ‘directly accusatory[.]’ ” Id. at 400 (quoting Gray, 523 U.S. at 193-94, 118 S.Ct. 1151).

. Similarly, I am not persuaded by the Commonwealth's argument that the Redacted Statements were too confusing for the jury to deduce the identity of the named confederates. The Commonwealth asserts that the "large number of codefendants and conspirators made it far too difficult to keep track of each assailant, particularly where the redac-tions suggested that the confederates included individuals other than those on trial.” For instance, the Commonwealth argues that Finney's redacted statement replaced five individuals' names with "blanks” but that only four codefendants were on trial. The Superior Court found this line of argument persuasive. Gray, however, contradicts the Commonwealth’s argument because there the Supreme Court held that the class of statements that replace a name with an obvious redaction violate Bruton regardless of whether a clear link can be drawn between the redacted name and any particular code-fendant. See Gray, 523 U.S. at 194-95, 118 S.Ct. 1151.

. The Commonwealth counters that because the jury convicted Defendants, it must have found Jackson credible. I fail to see how it is possible to determine whether the jury found Jackson credible. It is quite possible the jury found Jackson credible only in light of the Redacted Statements. It is also possible that the jury did not find Jackson credible at all and relied solely on the Redacted Statements.