J-S09001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
CHRISTOPHER COOLEY   :
  :
Appellant   :   No. 298 EDA 2025

Appeal from the PCRA Order Entered January 17, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006347-2014

BEFORE:   MURRAY, J., LANE, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:       **FILED APRIL 30, 2026**

Christopher Cooley (Appellant) appeals from the order dismissing his first petition for relief, which he timely filed pursuant to the Post Conviction Relief Act (PCRA).[1]  After careful consideration, we affirm.

This case arises from the violent robbery of Kevin Slaughter (Slaughter or the victim) by Appellant and his four co-defendants: Timothy Gooden (Gooden), Kylieff Brown (Brown), Shaheed Smith (Smith), and Kareem Cooley (Cooley).  The criminal episode began after a chance meeting between Slaughter and Brown at the SugarHouse Casino (the casino).

> [Slaughter] testified that he was on parole in December 2013 for a prior drug conviction.  On the evening of December 8, 2013, at approximately 8:00 p.m.[, Slaughter] went to [the casino] to play

---

\* Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

blackjack. He ran into co-defendant [] Brown, whom he met in prison. N.T., 5/18/16, at [] 56-69. The two sparked a conversation about drugs and a gun. [Slaughter] indicated to Brown that he could sell [both to Brown].

[] Brown stated to [Slaughter] that his cousin in Delaware was looking for 31 grams of cocaine. *Id.* at [] 60-61. Brown also wanted a gun. [Slaughter] told Brown that he could sell [Brown] a .380 caliber firearm. *Id.* at [] 62. Brown indicated that he wanted to do the deal immediately. *Id.* at [] 65.

Trial Court Opinion, 3/10/16, at 3.

On direct appeal, this Court described what next transpired:

Slaughter cashed out [his casino winnings in the amount of] $3,600.00 to $4,200.00, and left the casino[,] alone[,] to drop off the money at his home in Northeast Philadelphia.

Slaughter then returned to the casino to meet Brown[,] and they drove to South Philadelphia and picked up the drugs and gun. While they were driving, Brown was on the phone, telling the person he was speaking with their exact location. When Slaughter pulled over to stop at a store, a van drove by and then quickly returned, veering out of its lane towards [Slaughter's] vehicle. Slaughter then looked in his rear-view mirror and saw [] Gooden slumped down on the right side of his vehicle, creeping towards him with a gun. Slaughter attempted to flee in the car, but Gooden fired bullets at it. The car crashed into a telephone pole, and Slaughter exited it and started running.

Slaughter was shot in his lower back[,] and two or three men threw him into the van and tied him up with duct tape. The van fled the scene. Police quickly responded to a 911 call of gunshots and arrested Brown and [] Cooley, who had remained at the scene.

*Commonwealth v. Cooley*, 188 A.3d 578, 3474 EDA 2016 (Pa. Super. filed Mar. 28, 2018) (unpublished memorandum at 2).

As the van traveled towards Center-City Philadelphia,

Gooden and Appellant rode in the back with Slaughter.[FN1] Gooden repeatedly asked Slaughter where his money and drugs were, and threatened to kill and burn [Slaughter]. Appellant pistol-whipped Slaughter numerous times, and put a gun in his face. Gooden punched Slaughter in the face several times and knocked out his front tooth. The men put a bag over [Slaughter's] head at various points. Slaughter gave Gooden his address and the cell phone number of his wife, Samirah Savage [(Ms. Savage)], and told him to obtain the money he won at the casino from her. The men drove to [Slaughter's] home.

---

[FN1] **Appellant wore a mask over his face during the episode and Slaughter did not identify him at trial; the Commonwealth established** [**Appellant's**] **identity through circumstantial evidence.** (**See** N.T. Trial, 5/18/16, at 84; Trial Court Opinion, 3/10/17, at 5, 31). [At trial,] Slaughter identified Gooden as the man in the back of the van who did most of the talking during the incident…. (**See** [**id.**] at 83-84).

---

[Ms.] Savage received several phone calls from a blocked phone number, which she did not answer. She then received a call from an unblocked number, (215) [XXX]-0863, which she did not answer[. Ms. Savage thereafter] heard a knock on the front door. [Ms. Savage] went to the door, and a man with a cell phone told her that her husband was on the phone. She cracked the door open, took the phone, and spoke with Slaughter. [Slaughter] told [Ms. Savage] that he was being followed, that the person at the door was his friend, and to give the friend the money from the casino. When she questioned Slaughter, he told her to do what he said, or they would kill him. [Ms. Savage] gave the money and the phone to the man.

Once the conspirators had Slaughter's money, they drove behind a high school and threw him out of the van. Gooden or Appellant shot at [Slaughter] six times, with a bullet passing through his face and neck. A resident of the neighborhood heard gunshots, found Slaughter, and called 911. The conspirators drove the van to another location, doused it with an accelerant, and lit it on fire as a neighbor watched. Meanwhile, police responded to the scene where Slaughter was shot[,] and he was airlifted to the hospital. He underwent multiple surgeries and survived his injuries.

*Id.* (unpublished memorandum at 3-4) (emphasis added; footnote in original).

During the shooting investigation, the police executed search warrants for the cell phone records of Appellant, Gooden, Smith, and Brown,

> which showed frequent contact between them immediately before, during, and after the crime. The records showed that, during the relevant time-period, Appellant's cell phone had ten calls or text messages with Smith; sixty-two with Gooden; and thirty-five with [] Cooley. The Federal Bureau of Investigation (FBI) was able to reconstruct the conspirators' approximate locations throughout the crime using historical cell site data.[FN2] **Appellant's cell phone was at the approximate site of each stage of the crime**.
>
> ---
>
> [FN2] Special Agent William B. Shute of the FBI testified that historical cell site analysis is when investigators take the information contained in a suspect's call detail records, which are generated as a result of the suspect's phone calls, and analyze the calls and depict them onto a map. (*See* N.T. Trial, 6/01/16, at 40).
>
> ---
>
> Arrest warrants were issued for those defendants not immediately apprehended at the scene of the first shooting. Appellant and Gooden were arrested on February 25, 2014. **At the time of his arrest, Appellant had a cell phone in his possession with [the] phone number (215) [XXX]-0863.**
>
> ---
>
> [FN3] [Appellant's c]o-defendant[,] Smith[,] was arrested on June 5, 2014.

*Id.* (unpublished memorandum at 4) (emphasis added; one footnote omitted; remaining footnotes in original).

On June 13, 2016, following the joint jury trial of the four participants in the crime (Appellant, Brown, Gooden, and Smith), a jury found Appellant

- 4 -

guilty of one count each of attempted murder, aggravated assault, robbery, kidnapping, possession of an instrument of a crime; and two counts of criminal conspiracy.[2]  On September 9, 2016, the trial court sentenced Appellant to an aggregate prison term of 20-40 years, followed by 10 years of probation. Appellant filed post-sentence motions, which the trial court denied.  This Court affirmed Appellant's judgment of sentence on March 28, 2018.  **Cooley**, **supra** (unpublished memorandum at 15).  Appellant did not petition for allowance of appeal to the Pennsylvania Supreme Court.

Appellant timely filed the instant PCRA petition, his first, on February 28, 2019.  The PCRA court appointed counsel for Appellant, Lawrence J. O'Connor, Esquire (Attorney O'Connor), who filed an amended PCRA petition on July 17, 2019.  On October 9, 2019, the Commonwealth filed a motion to dismiss Appellant's PCRA petition.  However, on October 10, 2019, Appellant filed a motion claiming his conflict of interest with Attorney O'Connor, and seeking the appointment of new counsel.  The PCRA court held the matter "under advisement."  PCRA Docket Entry, 10/10/19.

Appellant, represented by Attorney O'Connor, filed a counseled, amended PCRA petition (amended PCRA petition) on October 9, 2019, asserting prosecutorial misconduct and the ineffective assistance of direct

_____

[2] 18 Pa.C.S.A. §§ 901(a), 2702(a), 3701(a)(1)(ii), 2901(a)(1), 907(a), 903.

appeal counsel. Appellant filed a motion to proceed *pro se* on November 1, 2019. However, on February 18, 2020, Appellant withdrew this motion.

On July 14, 2020, Attorney O'Connor filed a second amended PCRA petition on Appellant's behalf. On November 17, 2020, the Commonwealth filed a motion to dismiss all claims, except Appellant's ineffectiveness claim based on trial counsel's failure to call alibi witnesses. The Commonwealth agreed to an evidentiary hearing on this issue.

The PCRA court conducted the two-day evidentiary hearing on June 16, 2022, and June 29, 2022. On June 29, 2022, the PCRA court issued a notice of its intent to dismiss the Appellant's PCRA petition in its entirety. Notice, 6/29/22. On July 19, 2022, and August 9, 2022, Appellant filed *pro se* responses to the PCRA court's notice. On September 12, 2022, Appellant filed a *pro se* response asserting Attorney O'Connor's ineffectiveness and requesting the appointment of new PCRA counsel. *Pro Se* Response, 9/12/22, at 2. On September 15, 2022, the PCRA court permitted Attorney O'Connor to withdraw as counsel, and appointed James Lloyd, Esquire (Attorney Lloyd), as Appellant's PCRA counsel.

Attorney Lloyd, on behalf of Appellant, filed a counseled, supplemental amended PCRA petition (supplemental PCRA petition) on June 1, 2023. The Commonwealth filed a motion to dismiss Appellant's supplemental PCRA petition. Motion to Dismiss, 6/17/24. On July 18, 2024, for reasons not apparent of record, the PCRA court appointed new counsel for Appellant,

Stephen O'Hanlon, Esquire (Attorney O'Hanlon). On January 17, 2025, Appellant filed a counseled response to the Commonwealth's motion to dismiss. Response, 1/17/25. That same day, the PCRA court entered an order dismissing Appellant's petitions for PCRA relief. Appellant timely appealed. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

Did the PCRA court err, and was dismissal of Appellant's PCRA petition not supported by the record and free from legal error, because

[(1)] the ransom call directed toward [Ms.] Savage, the only substantive evidence against Appellant at trial, was initiated from a cell phone that the Commonwealth effectively admitted could not be tied to Appellant with any degree of certainty;

[(2)] there was prosecutorial misconduct and known false allegations in relation to Appellant being directly involved in the underlying crimes and wearing a mask;

[(3)] during closing argument and in relation to [a violation of] *Bruton* [*v. United States*, 391 U.S. 123 (1968),] (as well as ineffectiveness for failing to object and prejudice), there was false police testimony at trial; and

[(4)] there was credible alibi testimony presented at a PCRA evidentiary hearing?

Appellant's Brief at 4 (formatting, capitalization, and punctuation modified).

When reviewing the dismissal of a PCRA petition, we examine "whether the PCRA court's ruling is supported by the record and free of legal error. *Commonwealth v. Hereford*, 334 A.3d 903, 907 (Pa. Super. 2025) (*en banc*) (citation omitted). Our scope of our review "is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable

to the prevailing party at the PCRA court level." ***Commonwealth v. Conforti***, 303 A.3d 715, 725 (Pa. 2023) (citations omitted); ***see also Commonwealth v. Kapellusch***, 323 A.3d 837, 844 (Pa. Super. 2024) (stating appellate courts "grant great deference to the PCRA court's findings that are supported in the record." (citation omitted)). "[W]e review the PCRA court's legal conclusions *de novo*." ***Commonwealth v. Harper***, 230 A.3d 1231, 1236 (Pa. Super. 2020) (citation omitted).

Appellant first argues that the Commonwealth "failed to adduce substantive evidence tying Appellant to a ransom call." Appellant's Brief at 10. Appellant asserts that "[t]he cell phone with the number, (215) [XXX]-0863, was registered in Appellant's name, but apparently was not in Appellant's possession." ***Id.*** (punctuation modified). Appellant points to Philadelphia Police Detective Robert Daly's (Detective Daly) testimony that the only evidence inculpating Appellant "was the cell phone using the number (215) [XXX]-0863." ***Id.*** According to Appellant, Detective Daly acknowledged that Appellant "only obtained the cell phone the night after the underlying crime." ***Id.*** Appellant points out that the phone in Appellant's possession, at the time of his arrest, had the same number, but was a different physical phone. ***Id.***

Appellant's issue appears to challenge both the sufficiency of the evidence underlying the jury's verdicts, and the verdicts as against the weight of the evidence. Neither issue is cognizable under the PCRA. ***See*** 42 Pa.C.S.A.

§ 9543(a)(2) (identifying the issues cognizable under the PCRA); *Commonwealth v. Price*, 876 A.2d 988, 995 (Pa. Super. 2005) (rejecting a sufficiency challenge that was raised in a PCRA petition without an ineffective assistance of counsel analysis, because it is not cognizable under the PCRA); *see also Commonwealth v. Bell*, 706 A.2d 855, 861 (Pa. Super. 1998) (concluding that sufficiency claims are not cognizable under the PCRA). Because Appellant's claim is not cognizable under the PCRA, we decline to address it.[3]

In his second issue, Appellant argues that the Commonwealth committed prosecutorial misconduct during closing arguments. Appellant's Brief at 10. Appellant asserts that, during the PCRA proceedings, the Commonwealth admitted that during closing arguments, the prosecutor "made up a call that did not occur and that [was] alleged to have occurred on the night of the crime, tying Appellant to the crime." *Id.* at 10-11. Appellant claims the Commonwealth's admission to the prosecutor's conduct, during the PCRA hearing, constitutes after-discovered evidence.[4] Appellant further

_____

[3] We note that on direct appeal, this Court concluded that Appellant had waived his challenge to the sufficiency of the evidence. *Cooley*, 188 A.3d 578 (unpublished memorandum at 10). Notwithstanding, this Court observed that "there was sufficient evidence to establish Appellant's identity beyond a reasonable doubt." *Id.* (unpublished memorandum at 10 n.9).

[4] Appellant mistakenly cites to 42 Pa.C.S.A. § 9545(b)(1)(ii). Section 9545(b)(1)(ii) provides an exception to the PCRA's timeliness requirement for newly discovered facts, and does not apply to claims of after-discovered
*(Footnote Continued Next Page)*

claims that the prosecutor's misconduct was a due-process violation warranting the grant of PCRA relief. *See id.* at 11.

Though Appellant acknowledges that "[t]here was a sustained objection to the prosecutor's statement at trial," *see id.* at 12 (citing N.T. 6/3/16, at 18), Appellant asserts "it was only during PCRA proceedings that the Commonwealth admitted that there was false information during closing [arguments], which tainted the jury." *Id.*

The Commonwealth counters that Appellant failed to raise this issue in his PCRA petition. Commonwealth's Brief at 12. The Commonwealth argues that, because Appellant failed to raise this claim before the PCRA court, it is waived on appeal. *Id.*

Our review confirms that the Commonwealth acknowledged the prosecutor's improper reference to a phone call during Appellant's June 16, 2022, PCRA hearing. *See* N.T., 6/16/22, at 187-90. At that time, Appellant had not raised this issue in his PCRA petition or amended PCRA petition. Further, Appellant failed to raise this issue in his supplemental PCRA petition, filed on June 1, 2023, and did not seek to amend his petition to include this issue. Accordingly, we conclude the issue is waived on appeal. Pa.R.A.P. 302(a) (stating an issue cannot be raised for the first time on appeal).

_____

evidence. Section 9543(a)(2)(iv) identifies the following claim as cognizable under the PCRA: "The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § § 9543(a)(2)(iv).

- 10 -

Notwithstanding the waiver, we would conclude Appellant's claim warrants no relief. Appellant was aware of the prosecutor's comment during the prosecutor's closing argument. Appellant's trial counsel, Joshua Weil, Esquire (Attorney Weil), objected to the comment, and the trial court sustained the objection. N.T., 6/3/16, at 18. Thus, Appellant requested and was granted relief for the Commonwealth's improper statement. The Commonwealth's subsequent acknowledgement of the prosecutor's error provides no basis for additional relief regarding the prosecutor's reference to the phone call.

Appellant also claims that "there was false argument about Appellant wearing a mask[,] when there was no evidence to support the same and the issue was never even mentioned to the police." Appellant's Brief at 12. Appellant does not argue that Attorney Weil rendered ineffective assistance regarding this reference, only that the prosecutor's reference constituted misconduct. Appellant also fails to explain why this claim is not waived based on his failure to raise it on direct appeal. *See* 42 Pa.C.S.A. § 9543(a)(3) (requiring a petitioner to demonstrate that "the allegation has not been previously litigated or waived."). Further, Appellant's claim of prosecutorial misconduct is not cognizable under the PCRA. *See* 42 Pa.C.S.A. § 9543(a)(2) (setting forth the cognizable claims under the PCRA). No relief is due.

In his third claim, Appellant argues that Attorney Weil rendered ineffective assistance by failing to present the alibi testimony of Rozena Moore

(Moore) (Appellant's mother), and Derrick Davis (Davis). Appellant's Brief at 16, 20. According to Appellant, the PCRA court "effectively ignored the [r]ecord in sustaining the conviction despite the alibi testimony." *Id.* at 20. Appellant further alleges that he "suffered prejudice" as a result of Attorney Weil's failure to present these alibi witnesses. *Id.* at 20-21.

The Commonwealth disagrees, arguing that Appellant waived this claim by raising it for the first time in this appeal. Commonwealth's Brief at 12.

We first address whether Appellant preserved this ineffectiveness claim for appellate review. Our review of the record discloses that, in his amended PCRA petition filed on July 14, 2020, Appellant asserted the ineffective assistance of Attorney Weil, for failing "to present appropriate alibi evidence[.]" Amended PCRA Petition, 7/14/20, ¶ 7.

Appellant's amended PCRA petition claimed that Davis would have testified that "he went to [Appellant's] home at 646 Reinhard Street at approximately 9:10 p.m. and watched football with [Appellant] until after 11:00 p.m." *Id.*, memorandum at 13 (unpaginated). Appellant attached to his amended PCRA petition an affidavit from Davis. *Id.*, exh. 2.

Appellant also claimed that Attorney Weil rendered ineffective assistance by failing to present the alibi testimony of Moore, who operated the daycare attended by Appellant's children. *Id.*, memorandum at 12 (unpaginated). Appellant claimed that Moore would have authenticated the daycare's drop-off/pick-up log sheet for December 8, 2013. *Id.* Appellant

asserts that the log sheet would have shown that Appellant picked his children up from the daycare at 6:00 p.m. *Id.* According to Appellant, Moore's testimony would have shown that Appellant's children were not at the daycare after 6:00 p.m. on December 8, 2013, throughout the night, and during the next morning.[5] *Id.*, memorandum at 12-13 (unpaginated).

Appellant further asserts that Moore would have testified that she received two phone calls from (215) XXX-0863 during the early morning hours; the caller was not Appellant; and the caller asked for Appellant's location. *Id.*, memorandum at 13 (unpaginated).

Thus, contrary to the Commonwealth's waiver claim, our review discloses that Appellant preserved, in his amended PCRA petition, his present ineffectiveness claims based on Attorney Weil's failure to present alibi testimony from Davis and Moore. Accordingly, we will address the merits of this issue.

> A PCRA petitioner claiming ineffective assistance of counsel
>
> will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."

_____

[5] Moore's affidavit stated that she provided Attorney Weil with a copy of the daycare's log sheet, and that counsel was supposed to call her as a witness. Amended PCRA Petition, 7/14/20, exh. 4. Moore stated that counsel informed her "he wasn't going to have me called as a witness because doing so would have altered his presentational defense on behalf of" Appellant. *Id.*

- 13 -

***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014) (quoting 42 Pa.C.S.A. § 9543(a)(2)(ii)).

To establish a claim of ineffectiveness, a PCRA petitioner must plead and prove that

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. … Finally, because a PCRA petitioner must establish all [three] prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

***Commonwealth v. Treiber***, 121 A.3d 435, 445 (Pa. 2015) (citations omitted).

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements … by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. To demonstrate [] prejudice, a petitioner must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. A failure to call a witness is not *per se* ineffective assistance of counsel[,] for such decision usually involves matters of trial strategy.

***Commonwealth v. Sneed***, 45 A.3d 1096, 1108-09 (Pa. 2012) (citations and quotation marks omitted).

"The long-accepted definition of alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." *Commonwealth v. Roxberry*, 602 A.2d 826, 827 (Pa. 1992) (citations and internal quotation marks omitted). Indeed, "[a]ll that is required is that, due to separation, it is impossible for the defendant to have committed the crime." *Commonwealth v. Dennis*, 17 A.3d 297, 302 (Pa. 2011).

Appellant first asserts that Attorney Weil rendered ineffective assistance by not presenting the alibi testimony of Moore. *See generally* Appellant's Brief at 16-17, 19-21. At the PCRA evidentiary hearing, Moore testified that on December 8, 2013, she was the owner of Rozena's Young and Restless Day-Care Center, which operated out of her home. N.T., 6/16/22, at 5, 8. Moore explained that in December 2013, she provided daycare to Appellant's three children. *Id.* at 7. Ordinarily, Moore explained, Appellant's children would arrive at the daycare at 7:00 a.m., and stay until 8:00 p.m. each day. *Id.* at 8. Moore stated that on December 8, 2013, "it started snowing real bad, so I had all the parents come pick up their children." *Id.* According to Moore, Appellant picked his children up at around 6:00 p.m. *Id.*

At the hearing, Moore identified a daycare log sheet indicating that Appellant picked his children up at 6:00 p.m. on December 8, 2013. *Id.* at 11. Moore confirmed that she observed Appellant pick up his children and sign the log sheet at 6:00 p.m. *Id.* at 11-12. Moore testified that she did not

see the children again for "a few days after that[.]" *Id.* at 12. According to

Moore, her daycare was closed on December 9, 2013. *Id.*

Moore confirmed that she told Attorney Weil that she was prepared to

testify at Appellant's trial, and Attorney Weil confirmed that Moore would be

called as a witness. *Id.* at 26. However, Moore stated that Attorney Weil

failed to call her as a witness, and offered no explanation for his decision. *Id.*

Attorney Weil testified regarding his consideration of Moore as an alibi

witness:

> I had known from the very first conversation with [Appellant] that
> his pattern of behavior was every day to pick his kids up at his
> mother's daycare, … but it was a daycare that his mother owned
> and ran that his kids would go to, particularly his 2-year-old son
> at the time.
>
> [Appellant] would then pick his child up, sign in the book and
> leave[,] **and while I didn't have an alibi witness**, my theory
> was at least I can show he picked the kids up, as he did every
> day, and went home with his kids. After that, I am still left with
> whatever the jury's conclusion would be, but at least I had a time
> frame.

*Id.* at 151-52 (emphasis added; punctuation modified).

Attorney Weil stated that, although Moore previously provided him with

the daycare log-in sheet, he could not find the document following the physical

relocation of his law firm. *Id.* at 152. Attorney Weil

> reached out to [Moore] to try and get another photocopy of the
> original to use, so when I called her to testify, as the custodian of
> the records, she could present and authenticate the document.

*Id.* at 153.

Attorney Weil indicated that during trial, Moore gave him a copy at the courthouse, but it was not for December 8, 2013. *Id.* Attorney Weil testified as to what next transpired:

[T]he very next day, I was presented with another form and in my estimation, in my belief, this was not legitimate. It appeared to me that the date had been corrected on there to be the date of the day in question. The names, the times, everything was 100 percent identical, including the order of the names on the sign in and sign out.

I confronted her about it and she said, well, I have the original – I am paraphrasing…. I said, well, now I can't even call you as a witness and I explained to her that ethically[,] I can't call her as a witness because she had augmented a document.

….

So that would explain, yes, there was a document and that also explains why I did not end [up] calling his mother who, otherwise, if it wasn't the document, she still could have [at] least testified that, yes, this is his pattern of behavior and he picked up the kids on such and such date and time[,] but I didn't think it was ethical for me to call her as a witness.

*Id.* at 154-55. Attorney Weil confirmed that he

didn't present alibi [evidence] at trial. I didn't have one. … [T]here was still a gap between 9:00 p.m. and 9:00 a.m.[,] which is when the events took place.

*Id.*

Appellant testified that he received, from his direct appeal counsel, the discovery from Attorney Weil's trial file. N.T., 6/29/22, at 9. This discovery included the sign-in log sheet from Moore's daycare. *Id.*

Upon review of the testimony, the PCRA court agreed with Attorney Weil that Moore's testimony would not have established an alibi for Appellant. *Id.*

at 71. The PCRA court's finding is supported by the above evidence. Moore's testimony, at best, would have accounted for Appellant's location at 6:00 p.m., and could not establish an alibi for Moore at the time of the criminal episode. *See Roxberry*, 602 A.2d at 827. Because there is no arguable merit to Appellant's ineffectiveness claim regarding Moore's alibi testimony, this claim merits no relief. *See Treiber*, 121 A.3d at 445.

Appellant also claims Attorney Weil rendered ineffective assistance for failing to provide the alibi testimony of Davis. Appellant's Brief at 20. At the evidentiary hearing, Davis testified that around noon on December 8, 2013, he went to Appellant's house to watch a football game. N.T., 6/29/22, at 110-11. According to Davis, he fell asleep and subsequently left Appellant's house, but came back to watch the night football game. *Id.* at 111. Davis testified he was not certain what time he arrived at Appellant's home. *Id.* Davis explained, "I was drinking[.] I fell asleep during the game." *Id.* at 112.

Davis stated that he left Appellant's home in the early hours of December 9, 2013. *Id.* at 111-12. According to Davis, Appellant's children were at Appellant's home at the time Davis departed. *Id.* at 112. Davis clarified that Appellant was present at home when Davis fell asleep and when he woke up. *Id.* at 117.

However, upon an inquiry by the PCRA court, Davis stated he watched the football game *at the home of Appellant's mother*, Moore:

THE COURT: … [At w]hich house were you two watching the game?

[Davis]:  We watched the game at [Appellant's] mom's house.

THE COURT:  At his mom's house?

[Davis]:  Yes.

THE COURT:  Where is that?  You know where it is because you bring your kids to there for day[]care; right?

[Davis]:  Yeah, South 60th Street.  I don't know the exact address.

*Id.* at 123.  Davis later repeated that they watched the game at Moore's home. *Id.* at 130.

Davis further stated that his children were not at Moore's daycare on December 8, 2013, because the daycare was closed on Sundays.  *Id.* at 132. Davis repeatedly confirmed that the daycare was not open on Sunday.  *Id.* at 133.  Davis testified, "I think [Appellant] got his kids from his mom [*sic*] house – no, his sister [*sic*] house." *Id.* at 134.  The PCRA court continued its inquiry:

THE COURT: Were you with [Appellant]?

[Davis]: Yes, when we got the kids, I believe.

THE COURT: How did you get the kids?  What did you do?

[Davis]: Drove.

THE COURT: Who drove?

[Davis]: I did.

THE COURT: So you took [Appellant] to get his kids?

[Davis]: Yes.

- 19 -

*Id.* at 134-35.[6]  Davis stated that they all returned to Moore's home, where the children slept "for a little bit." *Id.* at 137.  Davis asserted that he was asked to be a witness at Appellant's trial; he was willing to testify; but "nobody called me." *Id.* at 141.

Attorney Weil testified that he and Appellant discussed alibi witnesses "numerous times" while preparing for trial. *Id.* at 146.  Attorney Weil recalled the following:

> The first time I met with [Appellant] was … on July 9th of 2014. … [W]e got into a conversation and [Appellant] told me[:] Listen.  At the date and time in question, I was home.  My kids were asleep.  My baby mom was working.  …  [Appellant] was home with the kids, watching the football game ….
>
> ….
>
> … [Appellant] informed me [] that he was home with the kids, asleep …, … **he and a friend were sitting home, watching the game.**

*Id.* at 147-48 (emphasis added).  Appellant did not identify the "friend" to Attorney Weil at that time, "for fear of perhaps reprisal against that person. So I was not given a name." *Id.* at 148.

Attorney Weil indicated that he would have presented Davis as an alibi witness if he had been provided with the information in Davis's affidavit. *Id.* at 149.  Attorney Weil explained,

> [Appellant] and I had numerous conversations prior to trial and during the trial, but especially in the days leading up to the trial

_____

[6] Davis testified that Appellant's sister does not operate a daycare.  N.T., 6/29/22, at 135.

that the mother of his children and his own mother were not alibi witnesses, which is also why I never filed an alibi notice because they didn't address the actual time frame. **There was only one person that I was aware of, other than** [**Appellant**], **who could address that time frame, <u>and without having access to that person</u>, I could not present an alibi.**

….

… To the best of my knowledge, an individual did not appear for trial. They were not [t]here either as a witness or as an audience member. I never spoke to anybody. I was never introduced to anybody or never given any contact.

*Id.* at 149-50 (emphasis added).

The PCRA court deemed Davis's testimony incredible:

Davis's testimony was hard to follow as he kept shifting times and locations back and forth. **Davis was an incredible witness.** His testimony certainly would not have been beneficial under the facts and circumstances of the case[,] and its absence did not prejudice [Appellant].

*Id.* at 71 (emphasis added). The record supports the PCRA court's findings, and we decline to reweigh the evidence or usurp the PCRA court's credibility determinations. *See Commonwealth v. Flor*, 259 A.3d 891, 902 (Pa. 2021) ("We are bound by the PCRA court's credibility determinations, unless those determinations are not supported by the record[.]"). Because Appellant failed to prove prejudice resulting from the lack of Davis's testimony, Appellant's ineffectiveness claim merits no relief. *See Treiber*, 121 A.3d at 445.

In his fourth issue, Appellant argues that all prior counsel rendered ineffective assistance by failing to preserve and argue the violation of his Sixth Amendment confrontation rights, as explained in *Bruton*. Appellant's Brief at

- 21 -

16. Appellant claims that at trial, during closing arguments, the Commonwealth improperly referred to Brown's testimony, which purportedly identified Appellant as a co-conspirator. *Id.* at 15. Appellant claims that the Commonwealth failed to present the jury with a subsequent statement by Brown, which contradicted its previously referenced statement. *Id.* Without any analysis of the testimony, Appellant cites his supplemental PCRA petition, filed on June 1, 2023, as support for his issue.[7] *Id.*

In his supplemental PCRA petition, Appellant claimed that during closing arguments,

> The prosecutor directly stated that Brown described/identified [Appellant] as the man in the red hoody, who perpetrated the kidnapping. This was a reference to the statement given to detectives by Brown on December 9, 2023.
>
> While the prosecutor opted to present this statement from Brown to the jury during her case in chief, notably[,] she did not present the jury with Brown's subsequent signed, written statement to detectives made on January 28 and January 29, 2015.
>
> During the bifurcated 2015 statement, Brown identified Raheem Turner [(Turner)] … as the man in the red hoody on the night of the kidnapping.
>
> Significantly, the trial prosecutor was aware that Brown specifically identified Turner as the kidnapper in the red hoody during the 2015 statement because [the prosecutor] was present when the statement was taken.

_____

[7] We could deem Appellant's claim waived on this basis. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) ("We shall not develop an argument for [the appellant], nor shall we scour the record to find evidence to support an argument; consequently, we deem this issue waived."). We decline to do so.

Supplemental PCRA Petition, 6/1/23, ¶¶ 55-58 (paragraph designations, footnote, and emphasis omitted). Appellant claimed that the prosecutor "knowingly presented patently misleading information and argument to the jury." *Id.* ¶ 59.

Appellant averred that the trial court's "curative" instruction, issued at the opening of its final jury instructions, "did not instruct the jury that the statement of Brown and [] Cooley could not be used against [Appellant]." *Id.* ¶ 81.

Appellant also claimed that Attorney Weil rendered ineffective assistance because counsel's *Bruton*/Confrontation-Clause objections were "impermissibly vague, undetailed, untimely, or non-existent." *Id.* ¶ 83. Appellant argued that the failure of counsel to "craft and lodge" an adequate objection caused the admission of evidence that violated Appellant's constitutional rights. *Id.* ¶ 88. Appellant argued that "the path not offered to [Appellant] (namely, seeking a thorough redaction of Brown and [] Cooley's statements which would not have implicated [Appellant]) afforded a more potentially successful outcome than the course actually pursued …." *Id.* ¶ 90.

"Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has a right to confront witnesses against him." *Commonwealth v. Nealy*, 333 A.3d 393, 400 (Pa. Super. 2025) (citation omitted).

> In *Bruton*, the United States Supreme Court held that the admission into evidence of an extrajudicial statement of confession by non-testifying co-defendant A inculpating codefendant B in the crime, violated codefendant B's right of

cross-examination under the Confrontation Clause of the Sixth Amendment. In other words, as the High Court stated subsequently in ***Richardson v. Marsh***, 481 U.S. 200, 206 … (1987), "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." In reaching this holding, the High Court reasoned that, even if the jurors were instructed to the contrary, there remained a substantial risk that they would look to co-defendant A's incriminating extrajudicial statement in assessing codefendant B's guilt. ***Bruton, supra*** at 126, 128-29 … ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); ***see id.*** at 137 … ("[I]n the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [a codefendant's] constitutional right of cross-examination."). Thus, in ***Bruton***, the High Court created a narrow exception to the general legal principle that the jury is presumed to follow the court's instructions. ***Id.*** at 135-37 …; ***Richardson, supra*** at 206-07 ….

In ***Richardson, supra*** at 202, … the High Court considered whether ***Bruton***'s holding applies when co-defendant A's confession was redacted to omit any reference to co-defendant B, but co-defendant B was "nonetheless linked to the confession by evidence properly admitted against him at trial." In answering this question in the negative, the ***Richardson*** Court distinguished between a confession that was incriminating on its face to codefendant B (which was clearly subject to ***Bruton***'s rule) and a confession that was incriminating to co-defendant B only by inference from evidence subsequently introduced at trial. The ***Richardson*** Court held that the latter was not subject to ***Bruton***'s rule. ***Id.*** at 208 …. Thus, the High Court in ***Richardson*** limited ***Bruton***'s holding to statements of confession by co-defendant A that were facially incriminating to co-defendant B, exempting from ***Bruton's*** control those statements that were incriminating to co-defendant B only after connection with or linkage to other evidence admitted at trial. ***Richardson, supra*** at 208-09 ….

***Commonwealth v. Roney***, 79 A.3d 595, 623-24 (Pa. 2013).

We further observe that, "even where a redacted confession violates ***Bruton***, its admission might be harmless error if other properly admitted evidence overwhelmingly establishes the defendant's guilt." ***Nealy***, 333 A.3d at 401 (citation omitted). An error may be considered harmless "only if the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict." ***Commonwealth v. Brunson***, 347 A.3d 808, 824 (Pa. Super. 2025) (citation omitted). "Whenever there is a reasonable probability that the error might have contributed to the conviction, the error is not harmless." ***Id.*** (citation omitted).

In its opinion, the PCRA court confirmed the Commonwealth committed a ***Bruton*** violation, but concluded the error was harmless:

> [Appellant] rightly claims that the prosecutor referred to an unnamed codefendant in Brown's statement[,] and told the jury that it matched [Appellant]. The prosecutor also argued that it was similar to the description given by the victim, which was admissible, … that part. The part regarding reading in [] Brown's description was in violation of ***Bruton*** and its progeny.
>
> Since [Attorney Weil] objected to the remark after closing arguments, there was no reasonable basis for appellate counsel to fail to raise it on appeal. However, finding a ***Bruton*** violation does not alone mandate a new trial. A harmless error analysis[8] still must be employed to resolve the matter. There was inculpatory evidence outside of the description in the co[-]defendant's statement which provided overwhelming circumstantial evidence of [Appellant's] guilt. The cell phone data

---

[8] "Even when evidence is wrongfully admitted, [] such error is subject to harmless error analysis." ***Commonwealth v. Bieber***, 283 A.3d 866, 877 (Pa. Super. 2022).

> connected [Appellant] to time, location, and other participants in this crime spree. Therefore, [Appellant] was not prejudiced.

N.T., 6/29/22, at 53-54 (footnote added; punctuation modified). The record supports the PCRA court's analysis, and upon our review, we agree with its conclusion that the error was harmless and did not contribute to the verdict. Appellant's **Bruton** claim warrants no relief.[9]

Consequently, we affirm the PCRA court's order dismissing Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2026

_____

[9] In his fourth claim, Appellant also cites to **Napue v. Illinois**, 360 U.S. 264 (1959), and states that reversal is required "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Appellant's Brief at 13 (quoting **Napue**, 360 U.S. at 264). However, Appellant does not identify or discuss an alleged **Napue** violation. Thus, any claim related to a purported **Napue** violation is waived. **See Commonwealth v. Felder**, 247 A.3d 14, 20 (Pa. Super. 2021) (stating that "an issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived" (citation and emphasis omitted)).